Electronically FILED by
Superior Court of California,
County of Los Angeles
1/30/2025 11:04 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Salcido, Deputy Clerk

Christie Gaumer (SBN 150649)
Law Offices of Christie Gaumer
3940 Laurel Canyon Blvd, #733
Studio City, CA 91604
(323) 934-8500
christie@gaumerlaw.com

Attorney for Plaintiffs
TRAVIS ALEXANDER and
CRUX WEALTH ADVISORS, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES
### SOUTH DIVISION

| | |
|---|---|
| TRAVIS ALEXANDER, an individual, and CRUX WEALTH ADVISORS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>GARRY D. WHITFIELD, an individual, and RUSSELL N. BACON, an individual, and DOES 1 through 10, inclusive,<br><br>Defendant(s). | Case No.: 25LBCV00222<br><br>COMPLAINT FOR DAMAGES:<br>(1) BREACH OF CONTRACT;<br>(2) BREACH OF CONTACT;<br>(3) BREACH OF CONTRACT;<br>(4) BREACH OF CONTACT;<br>(5) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br>(6) FRAUD;<br>(7) THEFT; THEFT FALSE PRETENSE 11 DEL. C. §§ 841; 843;<br>(8) DECLARATORY RELIEF |

Plaintiffs, Travis Alexander ("Mr. Alexander") and Crux Wealth Advisors, LLC ("Crux") (collectively, "Plaintiffs"), by and through the undersigned counsel, hereby complain and allege as follows:

## I.    PARTIES

1.    Plaintiff, Mr. Alexander, resides, and at all relevant times alleged herein was residing, in King County, Seattle, Washington.

2.    Plaintiff, Crux, is, and at all relevant times herein was, a limited liability company with its principal place of business in Los Angeles County, California.

3.     Defendant, Garry D. Whitfield ("Whitfield"), resides, and at all relevant times alleged herein was residing, in Santa Clara County, Monte Sereno, California.

4.     Defendant, Russell N. Bacon ("Bacon"), resides, and at all relevant times alleged herein was residing, in Travis County, Austin, TX.

5.     Plaintiffs are informed and believe, and thereupon allege, that Defendants are stockbrokers and financial advisors[1] regulated by the Financial Industry Regulatory Authority ("FINRA") and the Securities and Exchange Commission ("SEC"). Defendants are affiliated with Raymond James Financial Services, Inc. ("RJFS"), as required by the Securities Exchange Act of 1934.[2] Currently, and at all relevant times, Plaintiff Travis Alexander ("Mr. Alexander") was and is the majority owner, Chief Executive Officer, and managing member of Crux Wealth Advisors, LLC ("Crux")—an investment advisor registered with the SEC.

6.     Plaintiffs do not know the true names and capacities of the defendants sued as Does 1 through 10, inclusive, whether individual, corporate, associate or otherwise, and therefore sues such defendants by such fictitious names. Plaintiffs are informed and believe, and therefore allege that each of the defendants sued as Does 1 through 10, is responsible in some manner for the wrongful conduct alleged below, and that Plaintiff's injuries and damages alleged below were proximately caused by such defendants' acts.  Plaintiffs will seek leave of Court to amend this complaint to allege such defendants' true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, when those names and capacities have been ascertained.  When referring to defendant or defendants herein, Plaintiff intends to refer to each and all of the unknown defendants, in each and every capacity sued herein. Also, when referring to defendants herein, such reference includes the specified defendant as Does 1 through 10.

7.     Plaintiffs are informed and believe, and on that basis alleges, that each defendant is, and at all relevant times was, acting both on its/his/her own behalf and as the agent, servant, representative, employee, joint venturer, and/or partner of each of the other co-defendants, and in doing the things alleged

---

[1] Defendants are authorized to perform investment advisor work as investment adviser representatives of Raymond James Financial Service Advisors, Inc. (CRD#: 149018).
[2] 15 U.S.C. §78o(a)(1) & (b)(8).

therein, each co-defendant was acting within the purpose, course and scope of such agency, employment and/or representation or pursuant to authority conferred upon that party by consent, approval and/or ratification of each of the other co-defendants, whether said authority was actual or apparent.  Each defendant authorized and ratified the actions of each of the other defendants as alleged herein.

## II.    JURISDICTION AND VENUE

8. This Court has jurisdiction over this action, pursuant to the parties' contractual agreements. Venue is proper in Los Angeles County, California, pursuant to § 18 of the Advisor Affiliation Agreement. The Purchase Agreement provides that Delaware law shall govern the substantive rights and duties of the parties, pursuant to § 12(d), while the Advisor Affiliation Agreement specifies both Delaware law and Los Angeles County, California courts as the proper forum, pursuant to § 18.

## III.    GENERAL ALLEGATIONS

9.    Prior to May 2022, Defendants were stockbrokers and financial advisors affiliated with Morgan Stanley ("MS").

10.    Consistent with the contracts between MS and Defendants, as well as MS's policies and procedures, Defendants were employees of MS, and as such, the customers served by Defendants were MS's customers.

11.    As MS employees, Defendants agreed to be subject to nonsolicitation covenants prohibiting them from soliciting or attempting to solicit, directly or indirectly, any of MS's customers whom Defendants served or whose names became known to Defendants while in the employ of MS.

12.    On May 2, 2022, Plaintiffs and Defendants entered into a series of contracts (the "May '22 Agreements") in which Mr. Alexander, the individual, is referred to as *Branch Owner* and *Principal* of Crux. Mr. Alexander and Crux are collectively referred to as *Buyer*. Defendants are individually and collectively referred to as *FA*, *Seller*, and the *Advisor*.

13.    The Parties entered into the May '22 Agreements with the shared goals of:

a.    effecting a transaction that facilitated Defendants' departure from MS, with the objective of leveraging Defendants' relationships with the customers of MS in such a manner that the customers of MS would terminate or reduce their business with

MS, in favor of continuing to work with Defendants upon their move to RJFS and Crux; and

       b.    the facilitation of establishing equal ownership percentages, among Defendants, of the new business, in which Defendants would operate as stockbrokers and financial advisors after departing MS (the "Business"). Given that Defendant Whitfield's client base at MS was larger than Defendant Bacon's, both Defendants agreed that Defendant Bacon must contribute additional capital to the Business, in exchange for an increase in ownership.

14.    The Business's speculative nature and high degrees of risk and uncertainty made it difficult for Defendant Bacon to obtain traditional lending to facilitate his purchase of additional ownership in the Business, and Defendant Whitfield demanded that he receive no less than one million dollars ($1,000,000.00) cash from the transaction.

15.    Given the above-mentioned obstacles, the Parties agreed that Plaintiffs' participation in the new venture provided a solution desirable to both Defendant Whitfield and Defendant Bacon.

16.    Plaintiffs' ability to infuse capital into the transaction provided precisely what Defendants needed to accomplish their respective goals. In exchange, Plaintiffs' interests would be served through remuneration received as a result of: (a) Defendants' affiliation with Crux; and (b) Plaintiffs' ten percent (10%) share of gross revenue of the Business.

17.    As depicted in Section 4 of the Advisor Affiliation Agreement ("AAA"), Defendants agreed to become "an Advisor within the branch of [Plaintiffs,]" in exchange for monetary consideration paid in the form of forgivable notes.[3]

18.    Defendants' agreement to affiliate with Crux (i.e., the AAA), by itself only resulted in Defendant Whitfield receiving seven hundred thirty-nine thousand six hundred twelve dollars and sixty-eight cents ($739,612.68) in cash proceeds of forgivable notes. Of that amount, approximately two

---

[3] A forgivable note is a loan, the proceeds of which are typically distributed to the borrower upon execution of the note. Thereafter, the principal and interest is imputed as income to the borrower, pursuant to an agreed-upon schedule of intervals, each at which a portion of the unpaid balance is forgiven. In the immediate matter, such forgiveness was agreed to be quarterly and is referred to as "bonus payments." See, Bonus Agreement ("BA"), p. 1; *Id.*, §§ 1, 3-5.

hundred seventy-five thousand six hundred fourteen dollars and sixty-eight cents ($275,614.68) was from Crux and an additional four hundred sixty-three thousand nine hundred and ninety-eight ($463,998.00) was from RJFS.

19.    To increase the amount of cash that Defendant Whitfield would receive, Mr. Alexander agreed to pay three hundred seventy-one thousand one hundred eighty-three dollars ($371,183.00) in exchange for ten percent (10%) of the Business (from Defendant Whitfield), and ten percent (10%) of all gross revenue received by the Business.[4]

20.    As indicated among and consistent with the May '22 Agreements, Defendant Whitfield received a total of six hundred forty-six thousand seven hundred ninety-seven dollars and sixty-eight cents ($646,797.68) from Plaintiffs. When combined with the four hundred sixty-three thousand nine hundred and ninety-eight ($463,998.00) from RJFS, the total amount received easily eclipsed the half-million-dollar amount that Defendant Whitfield demanded.

21.    Defendant Bacon received a total of ninety-one thousand eight hundred seventy-one dollars and fifty-six cents ($91,871.56) from Plaintiffs.

22.    In aggregate, Plaintiffs paid Defendants a total of seven hundred thirty-eight thousand six hundred sixty-nine dollars and twenty-four cents ($738,669.24), in exchange for ten percent (10%) of the Business' gross revenue and Defendants' affiliation with Crux.

23.    The May '22 Agreements consist of the: (a) Agreement for Partial Purchase and Sale of Practice ("Purchase Agreement"); (b) Advisor Affiliation Agreement ("AAA"); and (c) Affiliation Loan Agreement ("ALA"). It is of note that each Defendant executed his own ALA containing a Loan Schedule & Acknowledgement ("LSA"), Loan Amortization Schedule ("LAS"), and Bonus Agreement ("BA"). (Hereafter, collectively referring to both Bacon's and Whitfield's "ALAs, LSAs, LASs, or BAs.") (see, Exhibits 1, 2, 3)

---

[4] Agreement for Partial Purchase and Sale of Practice ("Purchase Agreement"), § 1(a)(i) and (vi) Whitfield, on behalf of Defendants, agreed to "assign, convey and transfer to [Mr. Alexander] ten percent (10%) of Seller'[s] (i) **rights to . . . all revenue related [to the Business]**, including . . . any residual commissions or residual payments related to the clients; (vi) ten percent (10%) of Seller[s]' right, title and interest in and to the assets and property of Seller related to the Business . . . **including but not limited to . . . ten percent (10%) of any gross revenue** received from RJFS after the Agreement Date" (emphasis added).

24.     The May '22 Agreements are inextricably intertwined. The breach of one triggers a breach of the others. Purchase Agreement, § 9(b)(1) (lists an executed copy of AAA as a document that is required to be delivered to Plaintiffs at closing); *Id.*, 2 (requiring "**all other documents** [Plaintiffs] reasonably determine necessary to consummate the transactions contemplated hereby and transfer the Assets, as set forth herein) (emphasis added); *Id.*, 6 (requiring Defendants "**enter into [AAA]** describing [Defendants'] duties and obligation after the Agreement Date") (emphasis added); *Id.*, 8(a)(i-ii) (expanding the scope of Defendants' indemnity obligations to include "any facts or circumstances which constitute a breach of any representation or warranty made by [Defendants] in [ ] **any other** [ ] **agreement or document** delivered by [Defendants] pursuant to th[e Purchase Agreement]; (ii) **any nonfulfillment or breach of any covenant or obligation of [Defendants] in [ ] any other agreement or document delivered pursuant to th[e Purchase Agreement]**") (emphasis added); *Id.*, (b) (expanding Plaintiffs' indemnity to include events "arising out of or attributable to . . . a breach of any representation or warranty made by [Plaintiffs] in th[e Purchase Agreement], or **any other certificate, agreement or document** delivered by [Plaintiffs] pursuant to th[e Purchase Agreement]") (emphasis added); AAA, § 10(iv) (Defendants "agree to an **advisor affiliation agreement**" in the event of a purchase of the Business by Mr. Alexander or Crux) (emphasis added); ALA, § 2.1 (in which Defendants agree to "comply with all the terms and conditions of th[e ALA] and will, if requested by Crux, execute **all instruments necessary** to consummate the transactions contemplated hereby") (emphasis added); *Id.*, 3.1 (defining an Event of Default to occur upon Defendant's "breach of or other failure to perform any term of th[e ALA], **any other agreement entered into by** either . . . (2) **[Defendant] and Crux** (including, without limitation any **affiliation agreement**) or (3) [Defendant] and [Mr. Alexander] (including, without limitation any **affiliation agreement**)") (emphasis added); *Id.*, 3.2 (expanding an Event of Default to include "any information furnished **in compliance with or in reference to** th[e ALA] **or any other agreement [Defendant] may enter into with either Crux or [Mr. Alexander]** (including, without limitation any **affiliation agreement**) [ ] deemed to be false or misleading") (emphasis added); LSAs, § 4 (declaring the foregoing "subject to the terms of the [ALA.]"); *Id.*, 5 (asserting that the LAS "is attached hereto"); BA, p. 1 (**incorporating by reference the AAA**, and declaring to refer to it as the "Advisor Agreement" in the BA) (emphasis added); *Id.*, (declaring that Defendant and Mr. Alexander "**entered into an [AAA],**

**May 2, 2022**") (emphasis added); *Id.*, §§ 2, 4 (conditioning Defendants' bonus upon **meeting requirements in the AAA**) (emphasis added); *Id.*, § 4(d) (articulating that the bonus is **contingent upon "the [AAA]** ha[ving] not been terminated or voided . . . and continu[ing] to govern the relationship between Crux and/or [Mr. Alexander], on the one hand, and [Defendant], on the other hand") (emphasis added).

25.     Performance by Plaintiffs under the Purchase Agreement was completed within approximately one hundred (100) days of the Parties signing. Purchase Agreement, § 2.

26.     However, Defendants' ongoing duties and obligations under the Purchase Agreement included, *inter alia*, the obligation to provide Plaintiffs with "business records . . . including, but not limited to, . . . accounting records . . . sales history and such other records and information necessary or desirable for [Plaintiffs] to carry on . . . in the ordinary course on and after the Agreement Date." *Id.*, § 1(a)(iii).

27.     In addition, Defendants were required to "convey and transfer to [Plaintiffs] **ten percent (10%) of any gross revenue** received from RJFS after the Agreement Date." *Id.*, § 1(a)(vi) (emphasis added).

28.     Between May 2022 and March 2024, all "gross revenue received from RJFS"[5] was directed through the use of a rep. code[6] that allocated 45% to Defendant Whitfield, 45% to Defendant Bacon, and 10% to Mr. Alexander.

29.     In or around early April 2024, Defendants conspired to surreptitiously commandeer all "gross revenue received from RJFS" (*Id.*) by urgently requesting that Plaintiffs create a new rep. code that would distribute evenly between Defendant Whitfield and Defendant Bacon, omitting the ten percent (10%) distribution of gross revenue to which Plaintiffs were entitled under the Purchase Agreement.

---

[5] Purchase Agreement, § 1(a)(vi) in which Defendants sold "ten percent (10%) of any gross revenue received from RJFS after the Agreement Date" to Plaintiffs.
[6] Rep. Code, for purposes of its use herein, refers to a unique identifier assigned to revenue resulting from work performed by the Business and received by RJFS. The rep. code determines the specific accounts to which RJFS disburses the revenue and in what proportion.

30.    Defendants' urgent request was accommodated by Plaintiffs based upon Defendants' fraudulent assurances that the new rep. code would be used in association with a very small amount of revenue generated from family members of Defendants' employee, named "Logan Smith."

31.    Within days of Defendants' above-depicted "conduct detrimental to the decorum or operation of [Crux or [Mr. Alexander]" (AAA, § 11), Plaintiffs redirected "all gross revenue [ ] from RJFS"[7] to be received by the new rep. code.

32.    Immediately after ensuring that they would be able to successfully steal the ten percent (10%) owed to Plaintiffs, on April 18, 2024, Defendant Whitfield informed Plaintiffs that he and Defendant Bacon were disaffiliating with Crux, in favor of affiliating with RJFS under a different Office of Supervisory Jurisdiction branch. Exhibit 4 (2024-04-18 Email notice of termination of affiliation (Whitfield).pdf)

33.    Upon RJFS's disbursement of gross revenue to the Business on April 26, 2024, Defendants received equal, fifty percent (50%) shares of all gross revenue received from RJFS. The ten percent (10%) portion purchased by Plaintiffs was successfully stolen by Defendants. Plaintiffs received nothing.

34.    Defendants' prior substantial breach of the Purchase Agreement described *supra* (¶ 30) meant that Defendants were confident that Plaintiffs would no longer receive the ten percent (10%) gross revenue share that they purchased.

35.    Defendants' April 18, 2024 written notice terminating their affiliation with Crux constituted a breach of the AAA, because Defendants never intended to pay or reimburse Plaintiffs "for **services rendered through the date of termination[,]**" as required during "**thirty (30) days'** prior written notice" period. *Id.*, § 11 (emphasis added); see *Id.*, § 3(b)(iv) (requiring Defendants to "**reimburse [Plaintiffs] for all fees, costs and expenses** which [Defendants] incur[] or [are] otherwise obligated to pay in connection with [Defendants'] performance of th[e AAA.]") (emphasis added); see *Id.*, Exhibit A (Defendants, "will be **solely and exclusively responsible for all costs and expenses associated with [Defendants'] business with RJFS and [Crux]**, including, but not limited to real estate leasing

---

[7] Purchase Agreement, § 1(a)(vi)

expenses, staffing . . . and such other support charges which RJFS, in the normal course of business, allocates directly to [Mr. Alexander]") (emphasis added).

36.    Defendants' April 18, 2024, written notice of disaffiliation also constituted an immediate and total breach of Defendants' obligations under the ALA, Sections 3.1, 3.2, and 3.4. See, ¶ 22 *supra*.

37.    Having failed to receive ten percent (10%) of Defendants' gross revenue (approximately forty-three thousand dollars [$43,000]) on April 26, 2024, Defendants' breach of the Purchase Agreement caused breaches of all May '22 Agreements (*supra*, ¶ 22), requiring Defendants' immediate reimbursement of expenses advanced by Plaintiffs, pursuant to the AAA, Section 5, and payment of the delinquent $43,000.

38.    Not only have Defendants refused to "convey and transfer to [Plaintiffs] ten percent (10%) of any gross revenue received from RJFS" and failed to reimburse Plaintiffs one hundred thousand dollars ($100,000.00) in expenses advance thereby, they have also refused to provide "accounting records . . . and such other records and information necessary or desirable for" Plaintiffs to determine the amount of "gross revenue received [by Defendants] from RJFS." Purchase Agreement, § 1(a) *et seq.*

39.    Despite Plaintiffs' requests and Defendants' contractual obligations, the above-enumerated breaches by Defendants persist, as of the date of this filing.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Purchase Agreement - Against All Defendants)**

40.    Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

41.    The May 2, 2022, Purchase Agreement between Plaintiffs and Defendants is a valid and enforceable contract.

42.    Defendants' contractual obligations pursuant to the Purchase Agreement include, but are not limited to:

      a.    conveying and transferring to Mr. Alexander ten percent (10%) of gross revenue received from RJFS;

b.     providing Plaintiffs with business records, including sales history and such other records and information necessary or desirable for Plaintiffs to carry on in the ordinary course;

c.     entering into an Advisor Affiliation Agreement (i.e., AAA); and

d.     indemnifying Plaintiffs against claims against Plaintiffs arising out of or attributable to a breach of any representation or warranty made by Defendants, pursuant to any other agreement or document delivered pursuant to the Purchase Agreement (e.g., the AAA);

43.    Defendants concerted and surreptitious actions to take, exercise control over, or obtain the ten percent (10%) share of gross revenue (property of which Plaintiffs have lawful ownership) constituted a total and substantial breach of Defendants' contractual obligations.

44.    By function of Defendants' possession and control of Plaintiffs' property, Defendants have converted the same for their own use.

45.    Defendants' persistent failure to provide Plaintiffs with records and information necessary or desirable for Plaintiffs to carry on in the ordinary course constitutes a material and substantial breach of Defendants' contractual obligations.

46.    Defendants' misrepresentations in and breaches of the AAA, ALAs, and BAs (*ibid*), either independently or collectively, constitute a breach of Defendants' duties of good faith and fair dealing imputed to the Purchase Agreement.

47.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Purchase Agreement.

48.    Defendants' breaches were willful and undertaken with the specific intent to deprive Plaintiffs of their contractual rights and benefits.

49.    As a direct and proximate result of Defendants' breaches of the Purchase Agreement, Plaintiffs have been injured in the following amounts:

a.     Lost revenue share from January 2024 through present (estimated to be approximately eighty four thousand three hundred thirty-nine dollars ($84,339.00);

b.     Projected future lost revenue share (in an amount to be proven at trial);

c.      Costs and expenses incurred investigating Defendants' breaches which are estimated to be approximately five thousand dollars ($5,000.00);

d.      Administrative costs of responding to Defendants' disaffiliation: (in an amount to be proven at trial); and

e.      Lost business opportunities and reputational damage (in an amount to be proven at trial).

50.    Defendants have been unjustly enriched by an amount to be determined at trial, but no less than two hundred and three thousand dollars ($203,000.00), as a direct result of their breaches of the Purchase Agreement.

51.    Defendants' herein-enumerated actions constitute a class-B felony under Delaware Code, Title 11, Chapter 5, Section 841 (2023).

**SECOND CAUSE OF ACTION**
**(Breach of Advisor Affiliation Agreement - Against Both Defendants)**

52.    Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

53.    The May 2, 2022 Advisor Affiliation Agreement (i.e., the AAA) between Plaintiffs and Defendants is a valid and enforceable contract.

54.    Defendants' contractual obligations pursuant to the AAA include, but are not limited to:

a.      bearing sole responsibility for reimbursing Plaintiffs for all fees, costs, and expenses that Defendants incur or are otherwise obligated to pay, in connection with Defendants' performance of the AAA;

b.      bearing sole and exclusive responsibility for all of Defendants' employees' fees, costs, and out-of-pocket expenses, as well as attorneys' fees and costs and any costs and expenses that RJFS allocated directly to Plaintiffs;

c.      reimbursing Plaintiffs for any costs or expenses incurred or paid by Plaintiffs promptly (but in any event, within ten (10) days) all such amounts;

d.      providing thirty (30) days' prior written notice, if or when terminating the AAA;

e.      refraining from engaging in conduct detrimental to the decorum or operation of Crux or Mr. Alexander;

f.      paying Plaintiffs for any outstanding fees, costs, and expenses due and payable or reimbursable upon termination of the AAA; and

g.      indemnifying Plaintiffs from and against all liabilities and costs arising from Defendants' misrepresentations, misconduct, or violations of the AAA;

55.     Defendants' misrepresentation that they were terminating the AAA consistently with the termination provisions contained therein (despite knowing that Plaintiffs were not going to receive the payments and reimbursements that they were owed), constitutes a material and substantial breach of the AAA.

56.     As a direct and proximate result of Defendants' breaches of the AAA, Plaintiffs have been injured in an amount to be determined at trial, but no less than one hundred twenty-seven thousand dollars ($127,000.00), consisting of reimbursable costs and expenses incurred by Plaintiffs.

57.     Defendants have been unjustly enriched in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000.00), as a direct result of their breaches of the AAA.

58.     Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the AAA.

59.     Defendants' breaches were willful and undertaken with the specific intent to deprive Plaintiffs of their contractual rights and benefits.

60.     Defendants' material and substantial breaches of the AAA have caused Plaintiffs to suffer additional consequential damages, including:

a.      loss of business opportunities;

b.      damage to business relationships with RJFS and other industry partners;

c.      administrative costs and expenses associated with Defendants' disaffiliation; and

d.      reputational harm in the financial services industry.

### THIRD CAUSE OF ACTION
**(Breach of Affiliation Loan Agreements - Against All Defendants)**

61.    Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

62.    The May 2, 2022 Affiliation Loan Agreements (i.e., the ALAs) between Plaintiffs and Defendants are valid and enforceable contracts.

63.    Defendants' contractual obligations pursuant to the ALAs include, but are not limited to:

    a.    being affiliated with Crux and/or Mr. Alexander;

    b.    complying with all the terms and conditions of the ALA and any other documents executed pursuant to it (e.g., AAA, Purchase Agreement, BA, etc…);

    c.    performing any term of any other agreement entered into by Defendants and Plaintiffs;

    d.    paying interest on all outstanding principal and interest under the ALA, at a rate of ten percent (10%) per annum (the "Default Rate");

    e.    repaying the outstanding amount owed under the ALA, immediately upon the occurrence of an event of default;

    f.    repaying any and all indebtedness, other than the amount outstanding, upon the occurrence of an event of default;

    g.    paying, upon demand, Plaintiffs any costs of collection, including reasonable internal and external attorneys' fees and the costs of defending any counterclaims (including but not limited to costs of obtaining money damages, incidental legal expenses, travel costs, and forum costs; and

    h.    waiving any applicable exemption that Defendant may have for attachment or garnishment of his disposable earnings, in excess of $500.00 per week, and allowing attachment and garnishment by Plaintiffs, subject to any applicable state or federal law limitations.

64.    Defendants' termination of the AAA immediately caused a material and substantial breach of the ALA.

65.    Defendants' fraudulent and surreptitious theft of Plaintiffs' ten percent (10%) of gross revenue constituted a breach of Defendants' duties of good faith and fair dealing under the ALA.

66.     Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the ALA.

67.     Defendants' breaches were willful and undertaken with the specific intent to deprive Plaintiffs of their contractual rights and benefits.

68.     As a direct and proximate result of Defendants' breaches of the ALA (see, *supra*), Plaintiffs have been injured in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000.00), consisting of reimbursable costs and expenses incurred by Plaintiffs.

69.     Defendants have been unjustly enriched in an amount to be determined at trial, but no less than three hundred twenty-four thousand and sixty-three dollars ($324,063.00), as a direct result of their breaches of the AAA.

70.     Plaintiffs' injury persists, as of the date of filing the immediate claim with the Court.

71.     Defendants' refusal to abide by their obligations under the ALA have directly and indirectly caused Plaintiffs to incur and spend approximately eighty nine thousand three hundred and thirty-nine thousand dollars ($89,339.00) on fees and costs of enforcing Plaintiffs' right under the ALA.

### FOURTH CAUSE OF ACTION
### (Breach of Bonus Agreements - Against All Defendants)

72.     Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

73.     The May 2, 2022 Bonus Agreements (i.e., the BAs) between Plaintiffs and Defendants are valid and enforceable contracts.

74.     Defendants' contractual obligations pursuant to the BAs include, but are not limited to, maintaining their affiliation with Plaintiffs.

75.     When Defendants' breached the AAA by engaging in conduct detrimental to the operation of Crux or Mr. Alexander (i.e., fraudulently working in concert to surreptitiously steal Plaintiffs' ten percent (10%) of gross revenue), Defendants' materially and substantially breached their duties of good faith and fair dealing associated with the BAs.

76.     When Defendants terminated their affiliation with Plaintiffs, they immediately and completely breached their contractual obligations associated with the BAs.

77.     Defendants' breaches of the BA directly and indirectly injured Plaintiffs in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against All Defendants)

78.     Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

79.     Implied in each of the May '22 Agreements was a covenant of good faith and fair dealing requiring Defendants to act in good faith and deal fairly with Plaintiffs.

80.     Defendants breached this implied covenant by:

a.      secretly planning to divert revenue, while maintaining the appearance of compliance;

b.      making false representations about the intended use of the new rep. code;

c.      deliberately structuring their disaffiliation to maximize harm to Plaintiffs; and

d.      refusing to provide required business records and accountings.

81.     As a direct and proximate result of these breaches, Plaintiffs have suffered damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Fraud - Against All Defendants)

82.     Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

83.     Defendants falsely represented to Plaintiffs the need for a new rep. code that split RJFS revenue equally (50/50) between Defendants to be created.

84.     Defendants falsely assured Plaintiffs that the new rep. code would be used for a *de minimis* amount of RJFS revenue, exclusively derived from family members of Defendants' employee.

85.     At the time when Defendants made false representations to Plaintiffs, Defendants knew and believed that the representations were false, or Defendants acted with reckless indifference to the truth.

86.     Defendants made the misrepresentations, intending that Plaintiffs would act by granting their request for a new rep. code based upon the purportedly de minimis allocation of RJFS revenue to the new rep. code.

87.     Plaintiffs issued the new rep. code requested, because they reasonably relied upon Defendants' false representations.

88.     As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs' reliance upon such have resulted in Plaintiffs suffering actual damages, including:

a.      loss of contractually-guaranteed revenue share in an amount equal to ten percent (10%) of gross revenue received by Defendants from RJFS, since January 2024;

b.      costs and expenses advanced to Defendants in reliance on their representations in an amount no less than $100,000; and

c.      lost business opportunities and reputational harm in an amount to be proven at trial.

89.     Defendants' fraudulent conduct was willful, malicious, and designed to deprive Plaintiffs of their rightful property, warranting the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Theft by False Pretense – Against All Defendants)

90.     Plaintiffs incorporate and reinstate the foregoing as though fully set forth herein.

91.     Defendants knowingly and intentionally created and reinforced false impressions to Plaintiffs, including but not limited to:

a.      representing that the new rep. code would only be used for a de minimis amount of revenue from family members of their employee;

b.      representing that they would honor their obligations under the May '22 Agreements;

c.      concealing their true intention to divert and convert all RJFS revenue to their exclusive benefit; and

d.      preventing Plaintiffs from discovering information about their scheme by withholding required business records and accountings.

92.     Defendants made these false representations with the specific intent to obtain and retain property belonging to Plaintiffs, namely Plaintiffs' contractually guaranteed ten percent (10%) share of gross revenue received from RJFS.

93.    Plaintiffs reasonably relied on Defendants' false representations, in that Plaintiffs:

a.    assisted Defendants in creating the new rep. code, as requested by Defendants;

b.    continued to provide services and advance expenses on Defendants' behalf; and

c.    did not take preventative measures to protect their revenue share.

94.    As a direct result of Defendants' false pretenses, Plaintiffs have been deprived of property, specifically:

a.    Plaintiffs' ten percent (10%) share of RJFS revenue since January 2024 (approximately two hundred and three thousand dollars ($203,000));

b.    Plaintiffs' costs and expenses advanced to Defendants (approximately one hundred thousand dollars ($100,000)); and

c.    Plaintiffs' future revenue share in an amount to be proven at trial.

95.    Defendants' conduct constitutes theft by false pretense under Delaware law.

96.    As a direct and proximate result of Defendants' criminal conduct, Plaintiffs have suffered damages in an amount to be proven at trial, but no less than three hundred and three thousand dollars ($303,000).

97.    Defendants' criminal conduct was willful, malicious, and undertaken with the specific intent to deprive Plaintiffs of their property, warranting the imposition of treble damages and punitive damages.

## V.    **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for declaratory relief from the Court, declaring:

1.    that the Purchase Agreement remains valid and enforceable;

2.    that Defendants are obligated to pay Plaintiffs ten percent (10%) of all gross revenue received from RJFS since inception of the May '22 Agreements;

3.    that such obligation continues on a forward-looking basis;

4.    that Defendants must provide a full accounting of all revenue received; and

5.    that the entire unpaid balance of the ALA is immediately due and payable.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  for all compensatory damages in an amount to be proven at trial, but no less than $632,063.00;

2.  for additional treble damages in an amount to be proven at trial, but no less than $1,186,189.00;

3.  for Plaintiffs' attorneys' fees and costs incurred in an amount to be proven at trial, but no less than $84,339.00;

4.  for pre- and post-judgment interest to be applied to all monetary damages awarded;

5.  for all consequential damages in an amount to be proven at trial;

6.  for exemplary damages and punitive damages in an amount to be proven at trial; and

7.  for any other and further relief, as the Court may deem proper.

Dated: January 29, 2025

/Christie Gaumer/
Attorney for Plaintiffs
TRAVIS ALEXANDER and
CRUX WEALTH ADVISORS, LLC

**VERIFICATION**

I, Travis Alexander, declare the following:

I am the Chief Executive Officer of Crux Wealth Advisors, LLC and a Plaintiff in this action. I have read the foregoing Complaint and know its contents. The matters stated in the Complaint are true of my own knowledge except as to those matters stated on information and belief, and as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

This the __29th__ day of January 2025.

_____
TRAVIS ALEXANDER

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF - 18

# Exhibit 1: Purchase Agreement

## AGREEMENT FOR PARTIAL PURCHASE AND SALE OF PRACTICE

**THIS AGREEMENT FOR PARTIAL PURCHASE AND SALE OF PRACTICE** (this "Agreement") is made and entered into as of May 2, 2022 (the "Agreement Date"), by and among: (i) Garry Whitfield, individuals having a collective business address at 901 South MoPac Expressway, Suite 220, Austin TX 78746 (the "Seller"), and (ii) Travis Alexander and Crux Wealth Advisors, LLC, a Delaware limited liability company whose business address is 3444 East Anaheim Street, Long Beach, California 90804 (collectively, the "Buyer").

**WHEREAS**, Seller is financial advisors and have developed a client base to which they provide fee-based financial advice, product solutions and other services (the "Business"); and

**WHEREAS**, Buyer is a financial advisor affiliated with Raymond James Financial Services, Inc. ("RJFS"); and

**WHEREAS**, Seller will be affiliating with RJFS and transferring their clients to Buyer after the Agreement Date.

**WHEREAS**, the Seller desire to sell to Buyer, and Buyer desires to purchase from Seller, ten percent (10%) of Seller' right, title and interest in and to the Assets (as defined below) of the Business on a going forward basis, including, pursuant to the terms and subject to the conditions hereafter set forth.

**NOW THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  **Sale of Business.**

    **(a)**    **Purchased Assets.**  As of the Agreement Date, Buyer agrees to purchase from Seller, and Seller agrees to sell, assign, convey and transfer to Buyer, on the terms set forth in this Agreement, ten percent (10%) of Seller' right, title and interest in and to the assets and property of Seller related to the Business (collectively, except for the assets specifically identified as "Excluded Assets" in Section 1(b) hereof, the "Assets"), including but not limited to the following:

        **(i)**    rights to the clients and all revenue related thereto, including all contracts, records and information related to the clients and any residual commissions or residual payments related to the clients;

        **(ii)**    of the professional and other goodwill and going concern value of the Business and the clients (the "Goodwill");

        **(iii)**    Seller' business records relating to the Business, including, but not limited to, Client and customer lists, lists of suppliers, accounting records (including work papers related thereto), correspondence, files, research data, contracts, advertising data, files on Client or other

customer contracts and sales history and such other records and information necessary or desirable for Buyer to carry on the Business in the ordinary course on and after the Agreement Date;

> (iv)    Seller' rights and claims against third parties relating to or arising from or out of the operation of the Business or any of the Assets;

> (v)    Seller other assets related to the Business, of every type, nature and description, together with all accretions and additions to the Assets that occur prior to the Agreement Date, pursuant to the Advisor Affiliation Agreement; and

> (vi)    ten percent (10%) of any gross revenue received from RJFS after the Agreement Date.

For the avoidance of doubt, the Assets are separate and apart from any monies due either party under any affiliation agreement(s) between Buyer and Seller.

(b)    **Excluded Assets.**  Notwithstanding anything in this Agreement to the contrary, Buyer shall not purchase, and Seller shall not sell, any of the following assets (the "Excluded Assets"): (i) Seller' business checking account; (ii) the cash on hand of the Business as of the Agreement Date, and (iii) any equipment, furniture, computers and peripherals and real property commonly associated with Business.

(c)    **Assumed Liabilities.**  Except as set forth in this Section 1(c), the parties intend for the Buyer to acquire ownership of the Assets free and clear of all claims, liabilities, debts, security interests or other liens or encumbrances (for which Seller shall remain responsible and shall satisfy in a timely manner), except that Buyer shall assume and satisfy in a timely manner the following liabilities (the "Assumed Liabilities"): (i) Seller' obligation to provide services to the clients at or after the Closing; and (ii) Seller' obligations arising at or after the Closing under all contracts and agreements, if any, assigned to and assumed by Buyer pursuant to this Agreement.

(d)    **Retained Liabilities.**  Except for the Assumed Liabilities specifically set forth in Section 1(c) above, Buyer shall not assume or become liable for any of Seller' claims, liabilities, debts, security interests or other liens or encumbrances of any kind or nature whatsoever and any contractual obligations under any contracts related to the Business and not assumed by Buyer under this Agreement.  For the avoidance of doubt, Seller shall remain liable for all of his expenses incurred in connection with the Business prior to the Agreement Date, and none of the expenses so incurred by Seller is being assumed by Buyer under this Agreement including rent and lease obligations.

2.    **Purchase Price.**  The parties agree that the total purchase price of the Business, Assets, and other covenants contained herein, is: **Three Hundred Seventy-One Thousand One Hundred Eighty-Three U.S. Dollars ($371,183)** to be paid as follows: (i) an initial payment of **one half (50%)** of the purchase price paid within thirty (30) days to Seller from signing, and (ii) a second payment of the remaining **fifty percent (50%)** of the purchase price within ninety (90) days after signing of this Agreement.

(a)    **Attrition.**  Buyer and Seller recognize client attrition may occur at no fault of the Seller or the Buyer after the Closing.  Buyer and Seller each agree to exert commercially

reasonable efforts to retain the Clients. Seller and Buyer agree that the Purchase Price shall be adjusted ninety (90) days after the Closing, commencing May 2nd, 2022, and continuing until Buyer has paid the Promissory Note in full, in order to compensate Buyer for potential attrition of Client assets, as follows:

    **(b)**    If the Retention Percentage of the expected client transition list (Exhibit B) is at least 85%, the Financial Package shall not be adjusted. In the event that the Retention Percentage calculated is less than 85%, the adjusted Financial Package shall be calculated according to the following schedule:

    If the Retention Percentage is less than 85%, then the actual retained percentage will be applied to the second payment of purchase price. For example, if the Retention Percentage is 70%, the second payment will be reduced by 30%.

    **(c)**    In the event the Retention Percentage falls below 85% due to a collectively agreed upon reduction client fees, the discount to payment may not apply.

    **(d)**    If the Retention Percentage reduction threshold is triggered solely from market decline, the discount to payment shall not apply.

**3.**    <u>**Seller' Representations and Warranties**</u>. Seller hereby represents, warrants, and covenants to Buyer, as of this Agreement Date and upon the Agreement Date, that:

    **(a)**    Seller is an individual

    **(b)**    Seller have all requisite power and authority necessary to execute, deliver, and perform his obligations under this Agreement and all documents and agreements necessary to effectuate this transaction. Seller have duly authorized, executed, and delivered this Agreement. This Agreement and all other documents and instruments required to be signed by Seller under this Agreement constitute the Seller' legal, valid, and binding obligations, enforceable against Seller in accordance with their respective terms.

    **(c)**    The execution, delivery, and performance by Seller of the obligations under this Agreement will not:

    **(i)**    Violate any provisions of law, any order of any court or other agency of government, or any indenture, agreement, or other instrument to which Seller is a party, or by which she is bound; or

    **(ii)**    Be in conflict with, result in a breach of, constitute (with due notice or lapse of time or both) a default under, result in the creation or imposition of any lien, security interest, charge or encumbrance of any nature whatsoever upon any of the Assets.

    **(d)**    Seller is not required to obtain any consent, approval, or authorization from, or to file any declaration or statement with, any governmental instrumentality or other agency in connection with or as a condition to execution, delivery or performance of the Agreement.

(e)    No claims, actions, suits, proceedings, or investigations are pending against or affect the Assets, at law or in equity, before or by any governmental agency or judicial forum; and Seller is not operating under, or subject to, nor is she in default with respect to any order, writ, injunction or decree or any court or government agency.

(f)    There is no fact or information presently known to Seller, which has not been disclosed to Buyer and which materially affects, or will materially affect, the Assets or Seller' ability to make the transfers contemplated herein.

**4.    Representations and Warranties of Buyer.**    Buyer hereby represents, warrants, and covenants to Seller, as of this Agreement Date and upon the Agreement Date, that:

(a)    Buyer is an individual resident of the State of Washington.

(b)    Buyer has all requisite power and authority necessary to execute, deliver, and perform his obligations under this Agreement and all documents and agreements necessary to effectuate this transaction.  Buyer has duly authorized, executed, and delivered this Agreement.  This Agreement and all other documents and instruments required to be signed by Buyer under this Agreement constitute the Buyer's legal, valid, and binding obligations, enforceable against Buyer in accordance with their respective terms.

(c)    Buyer is not involved in any undisclosed actions, proceedings, or investigations, which might adversely affect, limit, or impair Buyer's obligations hereunder.  Buyer's execution and delivery of this Agreement, and the consummation of the transactions it contemplates, will not (i) violate, breach, or be a default under any contract, agreement, or commitment to which Buyer is a party, or (ii) violate any order, injunction, judgment, license, permit, rule, regulation, or ordinance of any court, administrative agency, or governmental body.

(d)    Buyer has formed his own opinion as to the value of Seller' Assets being purchased hereunder.  The parties acknowledge Buyer has inspected the Assets to the full extent of Buyer's desire, and the Seller has given Buyer ample opportunity to conduct such inspections.

(e)    Buyer meets the requirements of the Raymond James broker dealer agreement.

**5.    Seller' Ongoing Conduct of Business.**    Seller and Buyer shall begin the transition of the clients to Raymond James immediately following the execution hereof.  Seller shall remain responsible for any Investment Practice broker commission chargebacks for periods prior to execution hereof.  If chargebacks are taken from the Buyer, the chargeback, at Seller' discretion can either be paid to Buyer within five (5) days of written notice or set off against the amount due under the terms of the Promissory Note.  Seller is responsible for any pre-closing E&O fees, any FINRA termination fees, his own legal fees, travel expenses and home office expenses incurred.

**6.    Advisor Affiliation Agreement.**    At the Closing, Buyer and Seller shall enter into Advisor Affiliation Agreement describing Seller' duties and obligations after the Agreement Date.

**7.    Allocation of Purchase Price.**    The Purchase Price shall be allocated as follows: 80% to goodwill.  The Seller and Buyer will be deemed to have accepted such tax allocated values for

purposes of this Agreement and the transaction contemplated hereby. Seller and Buyer agree that the values will be used for all reporting requirements for federal, state and local taxes.

**8.**    **Indemnification.**

   **(a)**    To the fullest extent permitted by law, Seller shall indemnify and hold Buyer harmless from any such debts, liabilities, losses, or claims asserted against Buyer or its affiliates, subsequent to the Agreement Date arising out of or attributable to: (i) any facts or circumstances which constitute a breach of any representation or warranty made by Seller in this Agreement, or any other certificate, agreement or document delivered by Seller pursuant to this Agreement; (ii) any nonfulfillment or breach of any covenant or obligation of Seller in this Agreement or any other agreement or document delivered pursuant to this Agreement; (iii) obligations under or pertaining to the Assumed Liabilities before the Agreement Date and obligations related to any liabilities retained by Seller hereunder; or (iv) the conduct of Seller with respect to owning the Assets or conducting the Business before the Agreement Date. Seller shall also indemnify and hold harmless Buyer from any and all bulk sales or other state-based taxes that may be or become due as a result of the parties' entry into this Agreement.

   **(b)**    To the fullest extent permitted by law, Buyer shall indemnify and hold Seller harmless from any such debts, liabilities, losses, or claims asserted against Seller, subsequent to the Agreement Date arising out of or attributable to: (i) any facts or circumstances which constitute a breach of any representation or warranty made by Buyer in this Agreement, or any other certificate, agreement or document delivered by Buyer pursuant to this Agreement; (ii) any nonfulfillment or breach of any covenant or obligation of Buyer in this Agreement or any other agreement or document delivered pursuant to this Agreement; (iii) obligations under or pertaining to the Assumed Liabilities on or after the Agreement Date; or (iv) the conduct of Buyer with respect to owning the Assets or conducting the Business on or after the Agreement Date.

**9.**    **Closing.**

   **(a)**    **Time and Place.**  The Closing shall take place on the Agreement Date, and shall be deemed effective as of 12:01 a.m. on that day. The Closing shall be held at the Premises, via the electronic exchange of documents, or as otherwise mutually agreed by the parties.

   **(b)**    **Closing Deliveries.**

      **(i)**    At the Closing, Seller shall execute (as applicable) and deliver to Buyer all of the following:

         **(1)**    the Advisor Affiliation Agreement;

         **(2)**    all other documents Buyer reasonably determines necessary to consummate the transactions contemplated hereby and transfer the Assets as set forth herein; and

         **(3)**    Updated client list.

      **(ii)**    At the Closing, Buyer shall execute (as applicable) and deliver to Seller all of the following:

       (1)     the monies as provided in Section 2;

       (2)     the Advisor Affiliation Agreement; and

       (3)     all other documents Seller reasonably determines necessary to consummate the transactions contemplated hereby and transfer the Assets as set forth herein.

**10.**    **<u>Survival of Representations and Warranties</u>.**  All representations or warranties herein shall survive the Closing hereunder.

**11.**    **<u>Notices</u>.**  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by certified mail, return receipt requested, or overnight express mail, postage and charges prepaid, addressed to the party to whom it is directed, at his or its address set forth below:

Buyer – 3444 East Anaheim Street, Long Beach, California 90804

with a copy (which shall not constitute notice) to: Rupp Baase Pfalzgraf Cunningham LLC, 1600 Liberty Building, Buffalo, New York, 14202, Attention: Benjamin D. Burge, Esq.

Seller –

with a copy (which shall not constitute notice) to: _____

**12.**    **<u>Additional Terms</u>.**

    **(a)**    **Modification: Waiver.**  This Agreement contains the entire agreement between the parties hereto with respect to the transaction contemplated herein and shall not be modified or amended except by an instrument in writing signed by each of the parties hereto.  Any modification or waiver of any provisions of this Agreement, or consent to any departure therefrom, shall be effective only in the specific instance, and for the purpose, for which given.  Neither any failure nor any delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall single or partial exercise thereof preclude any other or future exercise, or the exercise of any other right, power or privilege.

    **(b)**    **Binding Effect/Successors.**  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their heirs, personal representatives, successors, and permitted assigns.

    **(c)**    **Severability.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

    **(d)**    **Choice of Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its choice of law provisions.

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14F5

**(e)     Exhibits.**  All Exhibits attached hereto are incorporated herein and made a part hereof by reference.

**(f)     Headings.**  Section and paragraph headings in this Agreement are included for convenience or reference only and shall not constitute part of this Agreement for any other purpose.

**(g)     No Assignment Allowed.**  Neither Buyer nor Seller shall assign this Agreement or any part thereof without the prior written consent of both parties.  Any purported assignment without such written consent is void and unenforceable.

**(h)     Joint Preparation of Agreement.**  Each party has cooperated in the drafting and preparation of this Agreement.  Hence, in any construction to be made of this Agreement, the same shall not be construed against any party on the basis that the party was the drafter.

**(i)     Execution and Acknowledgment.**  By signing this Agreement, Buyer and Seller acknowledge they have had their attorney review this Agreement or have chosen not to do so.  By signing, Buyer and Seller acknowledge that they have read, or had read to them, and fully understand this Agreement and confirm that the document correctly states the terms and conditions as understood by the parties.

**(j)     Counterparts.**  The parties may execute this Agreement in any number of counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  Facsimile, .pdf, and emailed signatures shall be sufficient for all purposes.

[Remainder *of page intentionally blank.  Signature page follows* ]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement for
Partial Purchase and Sale of Practice as of the Agreement Date set forth above.

Seller:                                    Buyer:


*Garry Whitfield*                          *Travis Alexander*
427D00AF9C054FC...                         1E72F0C0252B41E...
GARRY WHITFIELD                            TRAVIS ALEXANDER




[signature page to partial purchase agreement]



4871-3952-0030, v. 1




**[Exhibit A]**

**(Client List)**

# Exhibit 2:
# Advisor Affiliation Agreement

## ADVISOR AFFILIATION AGREEMENT

**THIS ADVISOR AFFILIATION AGREEMENT** (this "Agreement") is dated and entered into as of May 2, 2022 (the "Transition Date") by and among Russell Bacon and Garry Whitfield, individuals residing in the State of Texas (collectively, "Advisor"), Travis Alexander, an individual residing in the State of Washington ("Branch Owner"), and Crux Wealth Advisors, LLC, a Delaware limited liability company with its principal place of business located at 3444 East Anaheim Street, Long Beach, California 90804 (the "Company," and together with Advisor and Branch Owner, each a "Party" and collectively the "Parties").

**WHEREAS**, Branch Owner is affiliated with Raymond James Financial Services, Inc. (together with its parent company, affiliates and subsidiaries and their respective directors, officers and employees, "RJFS"), a duly qualified and registered broker/dealer in accordance with the requirements imposed by applicable governmental authorities;

**WHEREAS**, Advisor, being duly qualified as a Registered Representative (as defined by Financial Industry Regulatory Authority ("FINRA") Rule 1220(b)(1), as may be amended from time to time), is affiliated with RJFS;

**WHEREAS**, Advisor operates Advisor's financial advisory practice under the name "The Cornerstone Group of Texas through _____, LLC, a ____(state) Texas limited liability company wholly-owned by (the "LLC," and such financial advisory practice, the "Business");

**NOW**, **THEREFORE**, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions.**

    (a)    "Advisor's Employees" means the employees employed by Advisor in connection with the Business, if any.

    (b)    "Clients" means all clients with accounts at RJFS.

    (c)    "FA Agreement" means that certain Raymond James Financial Services, Inc. FA Agreement entered into or to be entered into by and between Advisor and RJFS.

    (d)    "IBO Agreement" means that certain Independent Branch Owner Agreement by and between RJFS and Branch Owner, as amended or supplemented from time to time.

    (e)    "Non-Advisor Clients" means all clients with accounts at RJFS which are subject to the supervision or oversight of Branch Owner, the Company and/or their respective affiliates in connection with the performance of advisory services with respect thereto and which are not otherwise serviced by Advisor, the LLC or their respective affiliates, together with all prospective clients of Branch Owner, the Company and/or their respective affiliates.

(f)     "<u>Prohibited Activities</u>" means any work, contact, or services on or related to services competitive with the services provided by the Company, Branch Owner and Advisor.

(g)     "<u>Regulatory Authorities</u>" means the United States Securities and Exchange Commission ("<u>SEC</u>"), FINRA, the Division of Securities and Securities Commissioners of the applicable states and any other association, organization (including, but not limited to, self-regulatory organizations (each, an "<u>SRO</u>")), or governmental authority having jurisdiction over securities transactions by reason of any statute, rule or regulation or by membership or agreement with such association, organization or governmental authority.

## 2.    <u>Advisor Affiliation with RJFS.</u>

(a)     Advisor shall obtain, possess and at all times maintain all necessary licenses, qualifications, registrations and the like required by the Regulatory Authorities, RJFS and Branch Owner (collectively, the "<u>Licenses</u>" and each a "<u>License</u>"), including, without limitation, (i) General Securities Representative "Series 7," (ii) Uniform Combined State Law Examination "Series 66" or legal equivalent and (iii) any other state Licenses required by the states and jurisdictions where Advisor and Advisor's Employees service Clients. Advisor shall notify the Company immediately upon notice of the loss of any of License required hereunder or otherwise necessary for Advisor to conduct its business.

(b)     As of and at all times following the Transition Date, Advisor shall (i) be and remain qualified with the Regulatory Authorities as a Registered Representative of RJFS and retain Advisor's affiliation with RJFS and (ii) satisfy RJFS's requirements for affiliation with RJFS. Advisor shall be solely responsible for all costs and expenses incurred to obtain and maintain all Licenses as billed to Advisor by or on behalf of RJFS, including, without limitation, affiliation fees and technology and software-related fees and expenses.

## 3.    <u>Relationship of Parties.</u>

(a)     Neither this Agreement nor the cooperation of the parties contemplated hereunder shall be deemed or construed to create any partnership, employment, joint venture, or agency relationship between Branch Owner and Advisor or the Company and Advisor. The parties' relationships shall at all times remain that of independent contractors. In that regard, neither Branch Owner nor the Company has acquired any assets or liabilities of Advisor, any business entity to which Advisor is an owner, partner, officer, shareholder or director, or the Business.

(b)     Without limiting the generality of the foregoing, the parties acknowledge and agree as follows:

i.     Within the states that Advisor has secured the Licenses, and in accordance with applicable law and RJFS policies and procedures, Advisor shall be free to exercise his or her own judgment as to the persons he or she does business with and the time and place which he or she conducts that business.

ii.     Advisor shall not be restricted as to the hours worked, work location or other parameters of conducting the Business.

2

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381071F14F5

iii.     All parties acknowledge that Advisor is not an employee for state or federal tax purposes. Advisor is responsible for all taxes on earnings, those of Advisor's Employees and making contributions to the government-sponsored benefit programs. In particular Branch Owner and the Company have no obligations with respect to and are not responsible for, without limitation, the following: (1) withholding FICA (Social Security) from Advisor's payments; (2) making state or federal unemployment insurance contributions; (3) withholding state or federal income tax from payment to Advisor; (4) obtaining workers' compensation insurance on behalf of Advisor; (5) compensating Advisor's Employees.

iv.     Advisor, as an independent contractor, shall be responsible for and reimburse Branch Owner and the Company for all fees, costs and expenses which Advisor incurs or is otherwise obligated to pay in connection with Advisor's performance of this Agreement.

v.     Advisor has no authority to act, enter into any contract or incur any liability or obligation on behalf of the Branch Owner and/or the Company.

vi.     Advisor shall obtain and at all times maintain his or her own worker's compensation insurance, errors and omission insurance, general liability with $1,000,000.00 per incident naming the Company and Branch Owner as an additional insured. Copies of the aforementioned policies and the annually updated binder(s) shall be provided to the Company and Branch Owner.

**4.     Ownership of Advisor Client Relationships.** As an Advisor within the branch of Branch Owner or its successors or assigns, the ownership of Advisor's Client relationships is as follows:

(a)     Advisor will maintain ownership of:

i.     Transferring Client relationships that Advisor receives consent and approval from Regulatory Authorities to transfer within RJFS to the supervision of Branch Owner; and

ii.     any Clients approved by RJFS in accordance with applicable law and RJFS policies and procedures that (1) are not Clients of Branch Owner, the Company or either of their respective affiliates (including any associates or sub-associates), members, officers, or employees, (2) Advisor introduces to his or her own Business and (3) of whom Advisor is the servicing financial advisor;

(b)     Advisor and Advisor's Employees shall have no ownership, right, title or interest in or to any of the following:

i.     RJFS Clients (as defined in the FA Agreement); or

ii.     Clients or prospective Clients that Branch Owner or any other advisor associated or affiliated with Branch Owner, the Company or RJFS introduces to Advisor or Advisor's Employees. Branch Owner or such other advisor that introduces such Client or prospective Client to Advisor or Advisor's Employees shall maintain ownership of, including,

LEGAL\55303900\3

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14F5

without limitation, the right to service, that Client or prospective Client relationship, regardless of any compensation arrangement between Branch Owner or its affiliates and Advisor.

(c)    If Advisor dies or is disabled, the ownership of and all right, title and interest in and to all Clients of Advisor, including, without limitation, the right, title and interest in and to all Client accounts, lists, information, books, records, documents and the like, except as and to the extent prohibited by applicable law (the "Acquired Assets"), shall automatically and immediately transfer to Branch Owner, its appointed designee(s) or either of their respective successors and assigns, unless a separate written agreement with an entity other than the Company has been established, approved by Branch Owner and filed with RJFS and the Company, all in accordance with the terms and subject to the limitations set forth below:

i.    the purchase price of the Acquired Assets shall be the market value as determined by a third party appraiser chosen by the Branch Owner in his sole discretion;

ii.    the closing would occur within ninety (90) days of the death or disability of Advisor;

iii.    the market value will be paid out evenly over seven (7) years. The Branch Owner will execute an unsecured promissory note (the "Promissory Note") evidencing the outstanding payment owed to the Advisor or his successor and assigns. The Promissory Note will allow the Branch Owner to prepay part or all of the amounts payable thereunder at any time prior to the end of the Promissory Note term; and

iv.    the purchase price shall be subject to annual adjustments if the assets or revenues from the Acquired Assets decreases by fifteen percent (15%) or more. Upon the purchase of the Acquired Assets, an asset and revenue dollar amount will be allocated to the Advisor's Clients. The annual payment under the Promissory Note will be adjusted by the lower of the percentage decrease as of the anniversary date of the Promissory Note to compute the Promissory Note payment, but the payment shall be considered payment in full for that Promissory Note so that the term of the Promissory Note does not change.  For example, if the promissory note payment is $200,000 and the assets are reduced by thirty percent (30%) then the annual Promissory Note payment will be $140,000.00 as payment in full for the annual payment.

**5.**    **Expenses.**  Notwithstanding anything to the contrary set forth in this Agreement, Advisor shall be solely and exclusively responsible for all of Advisor's and Advisor's Employees' fees, costs and out-of-pocket expenses, including, but not limited to, all License fees, registration fees, transfer fees, taxes, insurance premiums and other amounts (including, without limitation, errors and omissions insurance), attorneys' fees, costs and expenses relating to Advisor's RJFS affiliation, memberships and dues, ticket charges, connection fees, support charges and other like fees, costs and expenses which RJFS allocates directly to Branch Owner in the ordinary course of business and which may be passed through to Advisor.  To the extent any such fees, costs or expenses described herein are incurred or paid by Branch Owner or the Company, Advisor shall promptly (and, in any event, within ten (10) days) reimburse Branch Owner or the Company, as applicable, for all such amounts.

6. **Observance of Regulatory Requirements and Applicable Laws.** Advisor shall, and shall cause Advisor's Employees to, comply with and adhere to all (a) applicable laws, ordinances, rules, regulations and interpretations of local, state and federal Regulatory Authorities, including, without limitation, privacy laws governing client information, and (b) and policies, procedures, rules, regulations, policies, and protocols of RJFS and Branch Owner.

7. **Trades**. Advisor acknowledges and agrees that Advisor is solely responsible for any and all trade errors that Advisor and Advisor's Employees make in the Business and Branch Owner and the Company shall have no liability, responsibility or obligation for any such errors. Any trades that Advisor or Advisor's Employees direct through the Company or Branch Owner which result in errors that were directed by Advisor or Advisor's Employees shall be reviewed by the Company. If Advisor or Advisor's Employees, as applicable, provided incomplete, untimely or inaccurate information, then the Advisor shall be solely responsible for any trade costs, including, without limitation, reimbursements to Clients, penalties, fees, fines or charges imposed on either the Company or Advisor for placing the trade. Advisor shall indemnify, defend and hold harmless Branch Owner, the Company and their respective affiliates, owners, officers, managers, members, employees, agents, successors and assigns from and against any and all claims, losses, liabilities, damages, costs, penalties, fees, fines, charges and expenses (including reasonable attorneys' fees) arising out of, resulting from or relating to any trade errors described in this Section 7.

8. **Compensation to Advisor.** The Company shall pay, or direct RJFS to pay, Advisor in accordance with the compensation schedule attached hereto as <u>Exhibit A</u>. The Company reserves the right, in its sole discretion, to change or modify the compensation Advisor is entitled to hereunder at any time and from time to time if there is a change or modification made by RJFS to its compensation plan by the same amount the Company has been affected, upon providing at least thirty (30) days' prior written notice to Advisor of any such change or modification. Any commissions or fees payable pursuant to this Agreement will be paid by the Company or RJFS, as applicable, only when such commissions or fees are received by the Company or RJFS, as applicable.

9. **Minimum Production.** To the extent RJFS establishes any minimum financial advisor production requirements, the failure of Advisor and Advisor's Employees to meet such minimum production requirements may result in Branch Owner or the Company being charged a fee. To the extent any such fee or other amount or penalty is charged, Advisor shall be responsible for reimbursing Branch Owner or the Company, as applicable, for such fee, amount or penalty charged. Branch Owner and the Company shall have the right to set off and offset any such charges against any compensation or other amounts owed to Advisor.

10. **Sale of Business; Buyout.**

(a) During the period beginning on the Transition Date (the "<u>ROFO Period</u>"), Advisor shall not, directly or indirectly (through an affiliate or otherwise), whether in a single transaction or series of related transactions, sell, transfer or dispose of (whether by merger, consolidation, recapitalization, sale of assets or similar transaction), or solicit or enter into any discussions or negotiations to sell, transfer or dispose of, any of the assets or equity interests in or of the Business, or otherwise negotiate the terms of, or enter into, any agreement to consummate

the same, with any third party (a "<u>Restricted Transaction</u>") except in compliance with the terms and conditions of this Section 10.

(b)    During the ROFO Period, the Company and Branch Owner (or their respective designees) shall have the exclusive right and option to purchase the Business (including, without limitation, all clients and client relationships, goodwill and intangible assets associated therewith, lists, records and documents relating to the acquired clients and commissions, payments, fees and other revenue derived from the acquired clients which are earned and received on or after the closing date) on a mutually agreed upon date and mutually agreed upon terms.  If, at any time during the ROFO Period, Advisor wishes to enter into any agreement with respect to, or to consummate, a Restricted Transaction, Advisor shall, without notifying any third party of Advisor's interest in the Restricted Transaction, provide prior written notice to the Company and Branch Owner of its offer to enter into such a transaction (the "<u>Offer Notice</u>").  Each Offer Notice constitutes an offer made by Advisor to enter into an agreement with the Company and Branch Owner (or their respective designees) in accordance with the terms set forth in this Section 10 (a "<u>ROFO Offer</u>").  The purchase price for the business assets of Advisor shall equal the fair market value of the Business as mutually agreed upon by the Parties following good faith negotiations; <u>provided</u>, <u>however</u>, that if the Parties are unable to mutually agree to a purchase priced, then then purchase priced shall be equal to the higher of two independent valuations by reputable independent appraisers mutually selected by the parties and, at Branch Owner or its designee's option, shall be payable as described in Sections 4(c)(iii) and (iv) of this Agreement.  At any time prior to the expiration of the ninety (90)-day period following Branch Owner's receipt of the Offer Notice (the "<u>Exercise Period</u>"), Branch Owner or its designee may accept the ROFO Offer by delivery to Advisor of a written notice of acceptance.  If, by the expiration of the Exercise Period, Branch Owner or its designee has not accepted the ROFO Offer, and provided that Advisor has complied with all of the provisions of this Section 10, at any time during the ninety (90)-day period following the expiration of the Exercise Period, Advisor may consummate the Restricted Transaction with a third party on terms that are the same or more favorable to Advisor as the terms set forth herein.  If such Restricted Transaction is not consummated within such ninety (90)-day period, the terms and conditions of this Section 10 will again apply and Advisor shall not enter into any Restricted Transaction during the ROFO Period without affording Branch Owner or its appointed designee the right of first offer on the terms and conditions of this Section 10.

(c)    In the event Advisor, on the one hand, and the Company and Branch Owner, on the other hand, have not mutually agreed to a sale of the Business to the Company and/or Branch Owner (or their respective designees) during the ROFO Period, the Company and/or Branch Owner (or their respective designees) shall have the exclusive right and option, but not the obligation (the "<u>Option</u>"), exercisable upon written notice to Advisor at any time during the one (1) year period immediately following the ROFO Period (the "<u>Option Period</u>"), to purchase the Business on the terms described in this Section 10(c), and Advisor shall not, directly or indirectly (through an affiliate or otherwise), enter into a Restricted Transaction during the Option Period.  In the event that the Company and/or Branch Owner (or their respective designees) exercise the Option during the Option Period, the purchase price for the Business shall be an amount mutually agreed upon by the parties following good faith negotiations; <u>provided</u>, <u>however</u>, that if the parties are unable to mutually agree to a purchase price, the purchase price shall  be equal to the greater of two (2) valuations of the Business as determined by reputable independent appraisers mutually selected by the parties (with one selected by each party).

(d)      With respect to any exercise of the ROFO Option pursuant to Section 10(b) or the Option pursuant to Section 10(c) and the proposed acquisition by the Company and/or Branch Owner (or their respective designees) of the Business in connection therewith, the parties shall enter into a final definitive purchase agreement (the "Purchase Agreement" and together with any agreements, documents and instruments ancillary thereto and to be entered into in connection therewith, collectively, the "Definitive Agreements") within ninety (90) days of the date the ROFO Option or the Option is exercised, which such Definitive Agreements shall memorialize, among other things, the following terms and conditions of such purchase and sale transaction:

i.      the purchase price shall be paid in cash or by a promissory note (which such promissory note shall permit the applicable purchaser(s) to prepay all or any part of the amounts outstanding under such promissory note at any time prior to the maturity date of the promissory note);

ii.      the Purchase Agreement shall consist of the terms described herein and contain representations, warranties, covenants (including, without limitation, covenants regarding non-solicitation and non-competition) and indemnities (including, without limitation, indemnification by Advisor and/or the LLC in favor of the purchaser(s) of any claims made against the purchaser(s)) customarily set forth in a purchase agreement for similar transactions, which such representations and warranties contained in the Purchase Agreement shall survive the closing;

iii.      the Definitive Agreements and the consummation of the transactions contemplated thereby shall have been approved by the applicable governing bodies of the respective parties and Advisor and/or the LLC, as applicable, shall have obtained all requisite third party consents and approvals (including, without limitation, the approval of RJFS) in form and substance reasonably acceptable to the purchaser(s);

iv.      Advisor and the LLC shall conduct the Business in the ordinary course as conducted prior to such purchase and sale transaction and there shall have been no material adverse change in the financial condition or assets of the Business or its business prospects prior to the consummation of such transaction; and

v.      Advisor shall agree to an advisor affiliation agreement with the Company on reasonable and mutually agreed upon terms (with customary restrictive covenants, including, without limitation, covenants regarding non-solicitation and non-competition).

**11.      Termination of Agreement.**  This Agreement may be terminated by any Party, with or without cause within reason, upon thirty (30) days' prior written notice to the other Parties sent by either e-mail, registered mail, certified mail or overnight delivery by an international delivery service.  Upon termination of this Agreement, any outstanding fees, costs and expenses shall still be due and payable or reimbursable, as the case may be, to the Company for services rendered through the date of termination.  Notwithstanding the foregoing, each Party hereby reserves the right to immediately terminate this Agreement without notice in the event of a material breach of the Agreement, including, but not limited to, engaging in conduct consisting of fraud, misappropriation, loss or suspension of Licenses, abuse of clients, failure to comply with applicable laws, both federal and state, or any rule, regulation, or interpretation of the Regulatory Authorities or policy of RJFS or the Company, loss of credentials and/or affiliation with RJFS,

states or jurisdictions in which he, she or it holds a License have terminated any such License for cause, or any conduct detrimental to the decorum or operation of the Company or Branch Owner by Advisor. RJFS shall have the right to immediately terminate the FA Agreement with or without cause, and Advisor further understands that Branch Owner may instruct RJFS to terminate the FA Agreement without or without cause in Branch Owner's sole discretion.

12. **Indemnification.**

(a)     Advisor shall indemnify, defend, and hold harmless Branch Owner, the Company and all of their respective officers, managers, members, employees, agents and owners from and against:

i.     all liabilities of any nature of Advisor, Advisor's Employees, agents, customers or others whether accrued, absolute, contingent or otherwise existing as of the Transition Date; and/or

ii.     all liabilities and costs arising out of the conduct of Advisor's business activity, including, but not limited to, any action, inaction, misrepresentation, omission, conduct, misconduct, unsecured debt, violation of the terms of this Agreement, RJFS's or Branch Owner's policy or any law, federal or state, any rule or regulation or interpretation of Regulatory Authorities, or otherwise by Advisor or Advisor's Employees

(b)     All liabilities set forth above shall include settlements, judgments, awards, interest, costs, whether incurred at arbitration, bankruptcy, or at the administrative, regulatory (including SRO), trial, appellate or post-judgment level.

(c)     All of the indemnification provisions of this Section 12 and Section 7 shall continue for a period of six (6) years following termination of this Agreement.

13. **Non-Solicitation.**  During the term of this Agreement and for a period of one (1) year immediately following the date of termination of this Agreement, Advisor shall not, and shall cause his affiliates (including, without limitation, the LLC) not to, directly or indirectly:

(a)     hire or attempt to hire any employee, contractor, or personnel or solicit or induce or assist in any manner any employee, contractor or personnel of the Company, Branch Owner or their respective affiliates to leave his or her position for any reason whatsoever, without the prior written consent of Branch Owner; or

(b)     solicit, influence or attempt to influence any Non-Advisor Client or other business relationship of Branch Owner, the Company or their respective affiliates to terminate or materially reduce their engagement of or business relationship with Branch Owner, the Company or their respective affiliates based upon or in connection with the misappropriation by Advisor and/or his affiliates (including, without limitation, the LLC) of Confidential Information (as defined below) or trade secrets of Branch Owner, the Company or their respective affiliates. Advisor shall not have, nor will Advisor take any other action which is intended to, or which could reasonably be expected to, adversely impact Branch Owner's, the Company's or either of their affiliates' relationship with such Non-Advisor Clients and business relationships.

Upon execution of this Agreement, the Advisor shall deliver to the Company and Branch Owner a non-solicitation and confidentiality agreement by each of the Advisor's Employees or affiliated independent contractors who are RJFS financial advisors in Advisor's Business.

**14.** **Confidentiality.** From and after the Transition Date (including after the termination of this Agreement), each Party will not use or disclose or convey to any third party, any Confidential Information; provided, however, that (a) a Party may furnish such portion (and only such portion) of the Confidential Information as such Party reasonably determines it is legally obligated to disclose if: (i) he, she or it receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a governmental authority, (ii) to the extent not inconsistent with such request, it notifies the disclosing Party of the existence, terms and circumstances surrounding such request and consults with the disclosing Party on the advisability of taking steps available under applicable law to resist or narrow such request, (iii) he, she or it exercises its reasonable best efforts to obtain a court order or other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information, and (iv) disclosure of such Confidential Information is required to prevent such Party from being held in contempt or becoming subject to any other penalty under applicable law, (b) Advisor may use Confidential Information as may be necessary for Advisor to perform his or her services or duties under this Agreement and (c) Advisor and his or her affiliates may use Confidential Information for purposes of (i) the exercise of rights, or performance of obligations, under this Agreement or the FA Agreement, or (ii) any filing of tax returns of Advisor or other administration of tax matters. For purposes hereof, "Confidential Information" means all information (whether or not specifically labeled or identified as "confidential"), in any form or medium, of the Company, Branch Owner or Advisor or of its customers, clients, suppliers, distributors or other business relations, including, without limitation, all information concerning finances, customer information, supplier information, products, services, prices, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Confidential Information shall not include any information that is or becomes generally known to and/or available for use by the public through no fault of the recipient of such Confidential Information or any of his or her representatives. Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit or restrict the Parties from (a) making any disclosure of information required by law, (b) providing information to, or testifying or otherwise assisting in any investigation or proceeding brought by any federal or state regulatory or law enforcement agency or legislative body, any regulatory or SRO ("Regulatory Organization"), or RJFS's Legal or Compliance Departments, or (c) testifying, participating in or otherwise assisting in a proceeding relating to an alleged violation of the Sarbanes-Oxley Act, any federal, state or municipal law relating to fraud or any rule or regulation of the SEC, the CFTC, FINRA, the New York Stock Exchange, or any Regulatory Organization. Further, nothing in this Agreement or any other agreement or document prohibits the either of the Parties from voluntarily communicating, without notice to or approval by the other Party, with any government agency or SRO about a potential violation of a law or regulation or SRO regulation.

15.    **Remedies.**  Advisor acknowledges and agrees that a breach or threatened breach of any provision of this Agreement may cause irreparable damage to the Company and Branch Owner and that the Company and Branch Owner may have no adequate remedy at law for such violation. Accordingly, the Company and Branch Owner shall be entitled to both legal and equitable remedies, including, without limitation, injunctive relief restraining Advisor and its Business from engaging in any Prohibited Activities, without the necessity of posting bond.  Furthermore, the Company and Branch Owner shall be entitled to injunctive relief without showing or proving the actual damage sustained or about to be sustained and such relief shall be cumulative and in addition to whatever remedies the Company and Branch Owner may have at law or in equity.

16.    **Severability.**  The Parties hereto intend all provisions of this Agreement to be enforced to the fullest extent permitted by law.  Accordingly, should a court of competent jurisdiction determine that the scope of any provision is too broad to be enforced as written, the Parties intend that the court should reform the provision to such narrower scope as it determines to be enforceable.  If, however, any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future law, such provision shall be fully severable, this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision were never a part hereof and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance, except to the extent such remaining provisions constitute obligations of another Party corresponding to the unenforceable provision.

17.    **Entire Agreement.**  This Agreement constitutes the sole and only agreement between the Parties related to the affiliation of the Advisor and the Company except as maybe noted in a separate agreement for such matters as office lease or as may exist between either of the Parties and RJFS. This Agreement correctly sets forth the obligations of the Company and Advisor to each other as of its date. The Parties agree to waive rights as to any conflicting laws which may nullify this Agreement to the full extent allowable by law.

18.    **Venue.**  In the event the Parties are not able to resolve any dispute between them arising out of or concerning this Agreement, or any provisions hereof, whether in contract, tort, or otherwise at law or in equity for damages or any other relief, then Advisor, Branch Owner and the Company hereby irrevocably submit to the exclusive jurisdiction of any state and federal courts located in Los Angeles County, California over any dispute, suit, action or proceeding, whether at law or in equity, arising out of or relating to or concerning this Agreement.

19.    **Miscellaneous.**

(a)    Governing Law.  As a limited liability company organized under the laws of the State of Delaware, the Company has an interest in having Delaware law applied to contracts with its employees, as well as disputes with them. Applying Delaware law in this fashion affords the parties predictability as to the law to be applied, as well as uniformity across the Company's affiliated financial advisors. The validity, interpretation, performance, and enforcement of this Agreement will be governed by the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Each Party agrees that it will not challenge the applicability of the laws of the State of

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14E5

Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction), in any suit or proceeding regarding the validity, interpretation, performance, or enforcement of any provision of this Agreement, regardless of who initiates such suit or proceeding.

       (b)    <u>Parties Bound</u>. This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective heirs, executors, administrators, legal representatives, successors and assigns as permitted by this Agreement.

       (c)    <u>Amendments</u>. This Agreement may be amended if all parties hereto agree and only by a written agreement.

       (d)    <u>No Waiver</u>.  No waiver by a Party of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by any Party of any right under this Agreement shall be construed as a waiver of any other right.

       (e)    <u>Notices</u>.  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if deliver or mailed, postage prepaid, certified mail, return receipt requested or by overnight express mail (i.e., Federal Express):

If to the Company & Branch Owner, to:
3444 East Anaheim Street
Long Beach, California 90804

With a copy to:

Rupp Baase Pfalzgraf Cunningham LLC
1600 Liberty Building
Buffalo, New York 14202
Attn: Benjamin D. Burge, Esq.

If to the Advisor, to:

[]

       (f)    <u>Survival</u>.  Termination of this Agreement will not affect the provisions of Sections 4, 5, 7, 8, 9, 10 and 12 through 19 of this Agreement, each of which shall survive such termination.

       (g)    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts and may be executed and delivered by facsimile or PDF copies, each of which is deemed to be an original and all of which, taken together, constitute one and the same agreement.

[Signature Page Follows]

11

IN WITNESS WHEREOF, the parties have executed this Agreement on the date and year first written above.

**COMPANY:**

CRUX WEALTH ADVISORS, LLC

By: _Travis Alexander_ _____
Name: Travis Alexander
Title: Sole Member

**BRANCH OWNER:**

_Travis Alexander_ _____
Travis Alexander

**ADVISORS:**

_____
Russell Bacon

_Garry Whitfield_ _____
Garry Whitfield

*Signature Page to Affiliation Agreement*

## **EXHIBIT A**

## **COMPENSATION SCHEDULE**

1. The Advisor will receive an initial payout rate of 85% less applicable fees of the revenue paid by RJFS from Advisor's Client relationships at RJFS. This payout rate is pre broker-dealer charges that include but are not limited to payout rate per product offering, asset management administrative fees, third party management fees, etc. The expenses can vary depending upon product and platform used. However, this payout rate will be consistent regardless of the products and services that generate the revenues. Any change to compensation for Branch Owner or the Independent Contractor Division at RJFS could have an impact on this Agreement and the compensation payable hereunder. The Branch Owner reserves the full right to change the fixed payout rate if RJFS changes its compensation plan for Branch Owners or financial advisors.

2. During the term of the Agreement, Advisor will be solely and exclusively responsible for all costs and expenses associated with Advisor's business with RJFS and Company, including, but not limited to, real estate leasing expenses, staffing, marketing, client entertainment, taxes, insurance, costs and fees relating to Licenses for financial advisors, registration fees, transfer fees, errors and omissions insurance, ticket charges, connection fees, subscriptions and such other support charges which RJFS, in the normal course of business, allocates directly to the Branch Owner or Advisor. Should the Advisors use the Company's asset management models ("LWO"), any fees incurred due to no fault of their own shall be paid by the Company.

3. If advisor refers other advisors who ultimately affiliate with CWA, advisor may be eligible additional compensation.

# Exhibit 3: Advisor Loan Agreements, Bonus Agreements, and Loan Amortization Schedules

## CRUX WEALTH ADVISORS, LLC

Affiliation Loan Agreement

This AFFILIATION LOAN AGREEMENT (this "Agreement") is made on May 2nd, 2022 (the "Effective Date") by and between Crux Wealth Advisors, LLC (referred to hereinafter as "Crux") and Garry Whitfield (referred to hereinafter as "FA"). Crux and FA may be referred to herein individually as a "Party" or collectively as the "Parties".

RECITALS

WHEREAS, FA has requested that Crux make a loan to FA (the "Loan"), and Crux has agreed to make the Loan, in an amount that has been agreed upon by Crux and FA (the "Loan Amount"), subject to the terms and conditions set forth in this Agreement and provided that FA agrees to repay the Loan in accordance with this Agreement and otherwise agrees to comply with his obligations under this Agreement.

NOW, THEREFORE, in consideration of the Loan, and in reliance on the covenants, terms and conditions set forth in this Agreement, Crux and FA agree as follows:

**1.       LOAN**

1.1       FA shall sign and deliver to Crux a Loan Schedule and Acknowledgement ("LSA") in the form attached to this Agreement as Exhibit A which specifies the Loan Amount agreed upon by Crux and FA. Upon FA's execution of the LSA, Crux shall lend the Loan Amount to FA. Upon FA's execution of the LSA, Crux shall lend the Loan Amount to FA. The interest rate for any such Loan shall be 1.88% (compounded daily) (the "Applicable Rate") and the Loan payoff period shall be as provided in the LSA. As long as both (x) FA's registration with Raymond James has not terminated and (y) FA's affiliation with Crux and/or its principal, Travis Alexander (the "Principal") has not terminated, FA shall pay a quarterly payment amount based on the LSA (the "Payments").

1.2       In the event that there are insufficient funds available on FA's blotter on the respective payout date to deduct all or any part of the principal or interest then due, Crux may, in its sole discretion, allow the unpaid amounts to be carried over to the following month's blotter and be deducted from that subsequent month's blotter, in addition to the principal and interest to become due in such following month ("Optional Rollover") or may declare an Event of Default in accordance with the provisions of this Agreement. FA understands that any Optional Rollover will be rolled over for no longer than three (3) consecutive months and that any rolled over amount plus any additional rolled over amount for the second month, plus the full payment amount due at the end of the third month following the Optional Rollover will be due at the end of such three (3) month period.

**2.       REPRESENTATION AND WARRANTIES, AGREEMENTS.**

2.1       FA will comply with all the terms and conditions of this Agreement and any other documents executed pursuant hereto. and will, if requested by Crux, execute all instruments necessary to consummate the transactions contemplated hereby.

2.2       FA has the full authority to enter into this Agreement and to comply with these provisions.

2.3       There is no material action, suit, proceeding, inquiry or investigation, at law or in equity, before any court, public body, or applicable regulatory body, pending or, to the best of FA's knowledge, threatened

which seeks to restrain or enjoin FA from entering into or complying with this Agreement or which could impact FA's registration as a financial advisor.

2.4     To the extent permitted by applicable law, FA hereby releases and holds Crux, the Principal and their affiliates harmless from any claim arising out of FA's actions or omissions in connection with the Loan, including but not limited to FA's activities financed by this Loan. This paragraph shall survive the termination of this Agreement.

2.5     FA is solvent and no proceeding under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, an assignment of substantially all assets, composition or other relief with respect to FA's debts has been initiated on a voluntary or involuntary basis in the last ten (10) years or is contemplated by FA as of the Effective Date.

2.6     FA has disclosed to Crux all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**3.     EVENT OF DEFAULT**. The occurrence of one or more of the following events will, at the option of Crux, constitute an event of default (an "Event of Default") hereunder:

3.1     FA's breach of or other failure to perform any term of this Agreement, the Raymond James Financial Services, Inc., the Independent Branch Owner Agreement ("IBOA"), the Raymond James Financial Services, Inc. FA Agreement ("FA Agreement"), or any other agreement entered into by either (1) FA and Raymond James, (2) FA and Crux (including, without limitation any affiliation agreement) or (3) FA and the Principal (including, without limitation any affiliation agreement);

3.2     Any warranty, representation or other statement by, or on behalf of, FA contained in this Agreement or in any information furnished in compliance with or in reference to this Agreement or the IBOA or FA Agreement or any other agreement FA may enter into with either Crux or the Principal (including, without limitation any affiliation agreement) is deemed to be false or misleading;

3.3     FA's association with Raymond James terminates for any reason whatsoever, including, but not limited to, Raymond James's termination of the relationship at any time, including as a result of FA's death or disability, while any part of the Loan (including accrued interest) remains outstanding;

3.4     FA's affiliation with either Crux or the Principal terminates for any reason whatsoever, including, but not limited to, either Crux or the Principal's termination of the relationship at any time, including as a result of FA's death or disability, while any part of the Loan (including accrued interest) remains outstanding;

3.5     FA's failure to remain registered as described in Paragraph 7 below;

3.6     FA's insolvency, the appointment of a receiver for any part of FA's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against FA; or

3.7     Crux in its discretion declares an Event of Default under Section 1.2 hereof.

**4.     REMEDIES**. Upon the occurrence of any Event of Default, Crux shall have the right, at any time thereafter immediately and without further notice, presentment or demand, to pursue any of the following remedies separately, successively or simultaneously:

4.1     Discharge Crux's responsibilities to FA under this Agreement and declare the outstanding balance of the Loan, any accrued interest on the Loan, and any or all other indebtedness then owing by FA to Crux immediately due and payable without presentation, demand for payment, notice of dishonor, protest, or notice of protest of any kind, all of which FA hereby expressly waives, and institute proceedings for collection. Upon the occurrence of an Event of Default, interest shall accrue on all outstanding principal and interest under this Loan at a rate of 10% per annum (the "Default Rate"); and

4.2.    File for arbitration (or suit if appropriate) and obtain judgment and, in conjunction with any action, Crux or the Principal may seek ancillary remedies provided by law, including levy of attachment and garnishment.

**5.      ADDITIONAL REMEDIES**. Upon an Event of Default, FA acknowledges and agrees that:

5.1     Crux shall be entitled to any costs of collection, including reasonable internal and external attorneys' fees and the cost of defending any counterclaims. Said costs of collection shall include all incidental legal expenses, travel costs, and forum costs;

5.2     Crux reserves the right, without foreclosing any other remedy that may be available to Crux, to withhold and setoff or deduct any indebtedness against any compensation, including but not limited to any commissions and fees, earned by FA but not yet paid to FA, along with any assets of FA (individually, jointly with others, or in any other capacity) held at Raymond James or at any affiliated entities, in order to offset any indebtedness FA owes Crux under this Agreement; and

5.3     FA will execute a reaffirmation of the Loan under this Agreement prior to any discharge of debt under any bankruptcy or insolvency proceeding and file the reaffirmation, along with all the required disclosures and statement of current income and expenses with the relevant court.

**6.      COSTS AND EXPENSES**. FA will pay to Crux and/or the Principal all costs and expenses reasonably incurred by Crux and/or the Principal for the purpose of maintaining, preserving, or enforcing their rights hereunder, including:

6.1     the cost of collection;

6.2     costs of obtaining money damages; and

6.3     a reasonable fee for the services of attorneys used by Crux and/or the Principal for any purpose related to this Agreement or the Loan, including consultation, drafting documents, sending notices, or instituting, prosecuting or defending litigation or arbitration, whether out of court, in trial, on appeal, in bankruptcy, or otherwise.

All costs and expenses shall be payable by FA to Crux and/or the Principal upon demand and shall bear interest at the Default Rate from demand until paid.

**7.      REGISTRATION.** FA understands and agrees that the loan of any amount under this Agreement is conditioned on FA's registration being approved by and continuing with the Financial Industry Regulatory Authority ("FINRA"), and any exchange or state in which FA seeks to conduct business.

**8.      SETOFF**. FA hereby grants to Crux a secured interest and a right of set off for the Loan upon any and all moneys, securities, and other property of FA and the proceeds thereof, now or hereafter held or received by or in transit to, Raymond James, or at any affiliated entities, from or for FA, and also upon any and all deposits (general or special) and credits of FA at Raymond James, or at any affiliated entities, at any

time existing. Upon the occurrence of an Event of Default, Crux is authorized at any time and from time to time, without notice to FA, to set off, appropriate, and apply any or all items referred to in this section 8 against the Loan, pursuant to the right of set off.

**9.    INTEGRATION**. This Agreement (including any amendments, exhibits and addendums attached hereto) contains all of the agreements, representations and understandings made between the Parties with respect to the subject matter hereof, and supersedes all prior discussions, agreements and understandings of any kind, whether written or oral, and of every nature between them.

**10.    CONSENT TO INJUNCTIVE RELIEF AND/OR PREJUDGMENT WRIT OF GARNISHMENT**. FA warrants, covenants and agrees that Crux shall have no adequate remedy at law for a breach of or violation of the covenants contained in this Agreement. FA consents to the issuance of a temporary restraining order or a preliminary or permanent injunction to prohibit the breach of any provision of this Agreement, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated. FA consents to a prejudgment writ of attachment and/or garnishment in Court for any assets held (individually, jointly with others, or in any other capacity) outside of Raymond James. FA agrees that Crux does not waive any remedy at law in its efforts to secure injunctive relief and/or a prejudgment writ of attachment and/or garnishment if it files in Court, and specifically does not waive its right to arbitration of this Agreement. FA also understands that Crux may also be entitled to monetary damages, including, but not limited to, reasonable attorney's fees and costs, in the event of a breach or violation of this Agreement by FA, or any collection of this Agreement, in Court and/or in arbitration.

**11.    MODIFICATION**. This Agreement may not be modified except in writing signed by both Parties. Oral modifications of this Agreement are void and unenforceable.

**12.    TERMINATION**. This Agreement shall terminate upon FA's full repayment of the Loan Amount, any accrued interest and any other amounts due and owing by FA pursuant to this Agreement.

**13.    ARBITRATION AND CHOICE OF LAW**. The Parties agree that any dispute, claim, or controversy concerning this Agreement shall be resolved by binding arbitration in accordance with the then existing Rules of FINRA and its Code of Arbitration Procedure. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The Parties agree that the statutes of limitation and repose of the laws of the State of Delaware, shall apply to all arbitration proceedings arising out of or relating to this Agreement such that all claims, which would have been barred, waived, limited or restricted by such laws if filed with the judiciary, shall also be forever barred from claims under any applicable arbitration (or mediation) proceedings. Failure to institute an arbitration (or mediation) proceeding within the periods required for filing a claim or initiating a suit under such laws shall constitute an absolute bar (and a waiver thereof) to making a claim under this Agreement and to instituting any such arbitration (or mediation) proceedings respecting such controversy or claim. This Agreement to arbitrate survives the termination of FA's affiliation with Crux and/or the Principal. Further, this Agreement shall be interpreted in accordance with the laws of the State of Delaware.

**14.    ASSIGNMENT**. FA may not assign his or her rights or obligations under this Agreement. Notwithstanding the foregoing, Crux may assign its rights, responsibilities and obligations to a parent (direct or indirect), subsidiary or an affiliate thereof.

**15.    NOT AN EMPLOYMENT CONTRACT / AFFILIATION EXPLAINED**. FA expressly acknowledges that this Agreement is not an employment contract or an agreement to employ the FA for a specified period of time or a promise of continued employment with either Crux or Raymond James for any period of time whatsoever. FA further expressly acknowledges and agrees that he or she is an independent contractor associated with Raymond James and affiliated with Crux. FA has no authority to bind Crux in

any way.

**16.    SEVERABILITY**. Should any part of this Agreement for any reason be declared by any court (or arbitration panel) of competent jurisdiction to be legally invalid, void, or unenforceable, such decision shall not affect the validity of the remaining portions of this Agreement, which remaining portions shall continue in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated therefrom, it being the intent of the Parties that they would have executed the remaining portions of this Agreement without including any such part or portion which may for any reason be declared invalid, void, or unenforceable.

**17.    WAIVERS**. FA waives presentment, protest and notice of dishonor of any negotiable or commercial paper to which it is or may become a party, that may at any time come into the hands of Crux. Crux shall not, by any act, delay, omission, or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Crux, and then only to the extent therein set forth. A waiver by Crux of any right or remedy on any one occasion shall not be construed as a bar to, or waiver of, any such right or remedy which Crux would otherwise have on any subsequent occasion.

**18.    FURTHER ASSURANCES**. FA agrees to execute any further documents, and to take any further actions, reasonably requested by Crux to evidence or perfect the security interest granted in this Agreement, to maintain the first priority of the security interests, and to effectuate the rights granted to Crux herein.

**19.    WAIVER OF GARNISHMENT OF WAGES**. If FA is a head of a family, to the extent permitted by applicable law, FA hereby knowingly, voluntarily, and intentionally waives any applicable exemption FA may have for attachment or garnishment of FA's disposable earnings in excess of $500.00 a week, and agrees that upon an Event of Default, Crux may attach or garnish such disposable earnings, subject to any applicable state or federal law limitations. If FA is not a head of a family, to the extent permitted by applicable law, FA understands that Crux may attach or garnish FA's disposable earnings, subject only to any applicable state or federal law limitations. For these purposes, FA's "disposable earnings" means any earnings remaining after the deduction of any amounts required by law to be withheld.

**20.    NO SETOFF RIGHT OF FA**. Claims of the FA arising out of his or her independent contractor relationship shall not be asserted as a basis for non-payment of the Loan. The FA has no right of set-off the amounts due under this Agreement.

**21.    MISCELLANEOUS**. In this Agreement, the terms "include," "including," "includes" are deemed to be followed by the words "without limitation." The terms "hereof," "hereunder," and "herein" shall refer to this Agreement as a whole and not to any particular section.

**22.    COUNTERPARTS**. This Agreement may be executed in one or more counterparts, each of which will be an original and all of which together will be deemed one and the same document.

**23.    CONFIDENTIALITY**. THE EXISTENCE OF THE LOAN THAT IS THE SUBJECT OF THIS AGREEMENT SHALL BE KEPT IN STRICTEST CONFIDENCE BY FA AND SHALL NOT BE DISCLOSED EXCEPT IN RESPONSE TO A WRITTEN INQUIRY FROM A SELF REGULATORY ORGANIZATION OR GOVERNMENTAL AGENCY, A PROPERLY ISSUED JUDICIAL PROCESS, A SUBPOENA FROM AN ARBITRATION PANEL OR FOR THE LIMITED PURPOSES OF ALLOWING FA TO PREPARE REQUIRED TAX REPORTING FORMS AND TO RESPOND TO INQUIRIES FROM STATE OR FEDERAL TAX AUTHORITIES.

In the event that FA is served with judicial process, a subpoena from an arbitration panel or any other forum, or a written inquiry from any self-regulatory organization seeking disclosure of matters relating to the grant

of existence of the Loan that is the subject of this Agreement, the undersigned shall immediately provide written notice of such process to Crux in order that Crux may seek to protect its interest in preserving the confidentiality of such matters. Nothing in this Agreement shall prohibit or limit FA from initiating communications with, or responding to an inquiry from, any regulatory authority or governmental agency or entity, to report possible violations of federal law or regulation, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. No prior authorization from Crux shall be required to make any such reports or disclosures and no notice is required to Crux that such reports or disclosures have been made.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

FA acknowledges that (i) he or she has read and understands and consents to all of the terms and conditions of this Agreement, (ii) FA had the opportunity to consult with independent legal counsel regarding the terms of this Agreement, (iii) the execution of this Agreement is a voluntary act and (iv) his or her signature binds FA to the terms of this Agreement.

*Garry Whitfield*

DocuSigned by:
427D60AF9C834FC...
_____
Signature of FA


Garry Whitfield
_____
Print Name of FA


5/2/2022
_____
Date


ACKNOWLEDGED AND AGREED TO:

CRUX WEALTH ADVISORS, LLC

*Travis Alexander*

DocuSigned by:
1E72F6C6252B41E...
By _____
Name:  Travis Alexander
Title:  CEO

**Loan Schedule & Acknowledgement**

**Exhibit A to Affiliation Loan Agreement, Dated May 2nd, 2022, by and between Crux Wealth Advisors, LLC and Garry Whitfield, Financial Advisor**

1.      Loan Amount: $275,614.68

2.      First Month of Payor Deductions: July 2022

3.      Last Month of Payor Deductions: April 2027

4.      The foregoing is subject to the terms of the Affiliation Loan Agreement entered into between Crux Wealth Advisors, LLC and the undersigned dated May 2nd, 2022.

5.      Loan Amortization Schedule is attached hereto.

Loan receipt acknowledged and schedule accepted:

DocuSigned by:

*Garry Whitfield*

427D08AF9C054FC...
_____
Signature of Financial Advisor

Garry Whitfield
_____
Print Name of Financial Advisor

5/2/2022
_____
Date Signed

## Loan Amortization Schedule

| # | Payment | Principal | Interest | Balance |
|---|---------|-----------|----------|---------|
| 1 | 7,576.12 | 6,277.70 | 1,298.42 | 269,336.98 |
| 2 | 7,576.12 | 6,307.27 | 1,268.85 | 263,029.71 |
| 3 | 7,576.12 | 6,336.99 | 1,239.13 | 256,692.72 |
| 4 | 7,576.12 | 6,366.84 | 1,209.28 | 250,325.88 |
| 5 | 7,576.12 | 6,396.83 | 1,179.29 | 243,929.05 |
| 6 | 7,576.12 | 6,426.97 | 1,149.15 | 237,502.08 |
| 7 | 7,576.12 | 6,457.25 | 1,118.87 | 231,044.83 |
| 8 | 7,576.12 | 6,487.67 | 1,088.45 | 224,557.16 |
| 9 | 7,576.12 | 6,518.23 | 1,057.89 | 218,038.93 |
| 10 | 7,576.12 | 6,548.94 | 1,027.18 | 211,489.99 |
| 11 | 7,576.12 | 6,579.79 | 996.33 | 204,910.20 |
| 12 | 7,576.12 | 6,610.79 | 965.33 | 198,299.41 |
| 13 | 7,576.12 | 6,641.93 | 934.19 | 191,657.48 |
| 14 | 7,576.12 | 6,673.22 | 902.90 | 184,984.26 |
| 15 | 7,576.12 | 6,704.66 | 871.46 | 178,279.60 |
| 16 | 7,576.12 | 6,736.24 | 839.88 | 171,543.36 |
| 17 | 7,576.12 | 6,767.98 | 808.14 | 164,775.38 |
| 18 | 7,576.12 | 6,799.86 | 776.26 | 157,975.52 |
| 19 | 7,576.12 | 6,831.90 | 744.22 | 151,143.62 |
| 20 | 7,576.12 | 6,864.08 | 712.04 | 144,279.54 |
| 21 | 7,576.12 | 6,896.42 | 679.70 | 137,383.12 |
| 22 | 7,576.12 | 6,928.91 | 647.21 | 130,454.21 |
| 23 | 7,576.12 | 6,961.55 | 614.57 | 123,492.66 |
| 24 | 7,576.12 | 6,994.35 | 581.77 | 116,498.31 |
| 25 | 7,576.12 | 7,027.30 | 548.82 | 109,471.01 |
| 26 | 7,576.12 | 7,060.40 | 515.72 | 102,410.61 |
| 27 | 7,576.12 | 7,093.66 | 482.46 | 95,316.95 |
| 28 | 7,576.12 | 7,127.08 | 449.04 | 88,189.87 |
| 29 | 7,576.12 | 7,160.66 | 415.46 | 81,029.21 |
| 30 | 7,576.12 | 7,194.39 | 381.73 | 73,834.82 |
| 31 | 7,576.12 | 7,228.28 | 347.84 | 66,606.54 |
| 32 | 7,576.12 | 7,262.34 | 313.78 | 59,344.20 |
| 33 | 7,576.12 | 7,296.55 | 279.57 | 52,047.65 |
| 34 | 7,576.12 | 7,330.92 | 245.20 | 44,716.73 |
| 35 | 7,576.12 | 7,365.46 | 210.66 | 37,351.27 |
| 36 | 7,576.12 | 7,400.16 | 175.96 | 29,951.11 |
| 37 | 7,576.12 | 7,435.02 | 141.10 | 22,516.09 |
| 38 | 7,576.12 | 7,470.05 | 106.07 | 15,046.04 |
| 39 | 7,576.12 | 7,505.24 | 70.88 | 7,540.80 |
| 40 | 7,576.32 | 7,540.80 | 35.52 | 0.00 |

## CRUX WEALTH ADVISORS, LLC

Bonus Agreement

This BONUS AGREEMENT (this "Agreement") is made May 2nd, 2022 (the "Effective Date") by and between Crux Wealth Advisors, LLC (referred to hereinafter as "Crux") and Garry Whitfield (referred to hereinafter as "FA")

WHEREAS, Raymond James and FA entered into either the Raymond James Financial Services, Inc. ("RJFS" or "Raymond James") Independent Branch Owner Agreement ("IBOA"), or the Raymond James Financial Services, Inc. FA Agreement ("FA Agreement"), and the IBOA and the FA Agreement are hereinafter referred to as the "Advisor Agreement", wherein Raymond James and FA memorialized the terms under which FA shall conduct certain securities activities as an independent contractor of Raymond James;

WHEREAS, FA and the principal of Crux, Travis Alexander (the "Principal"), entered into an Affiliation Agreement, May 2nd, 2022 (the "Affiliation Agreement"); and

WHEREAS, Crux has agreed to pay a quarterly bonus to FA, as more particularly described herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable considerations, the receipt, sufficiency and adequacy of which are hereby acknowledged, Crux and FA agree as follows:

1. **BONUS**: Crux shall pay quarterly to FA $6,890.37 for a period of 40 quarters. For purposes of this Agreement, "quarterly" and "quarter" shall mean every three months based on Crux's fiscal year, commencing with the first full fiscal quarter of the FA's affiliation with RJFS and Crux.

2. **REGISTRATION**: FA understands and agrees that payment of any bonus under this Agreement is conditioned on FA satisfying all registration and licensure requirements, as described in the Advisor Agreement that FA has or will enter into with Raymond James and the Affiliation Agreement. Failure of FA to satisfy said requirements for any reason shall discharge all obligations of Crux under this Agreement.

3. **TIMING OF PAYMENTS**: Payments will be made quarterly during the second payroll period of the month immediately following the last month of each quarter. The first payment will be made during the second payroll period of the month immediately following the first full fiscal quarter of FA's affiliation with Crux.

4. **ELIGIBILITY**: FA understands and agrees that certain conditions must be met as of the dates that each of the quarterly bonus payments is made in order to be eligible for each such bonus payment. Conditions of eligibility as of each of those dates are:

    a.    FA must satisfy all registration and licensure requirements, as described in Article 2, Registration.

    b.    FA continues to act in the capacity of a financial advisor.

    c.    The Advisor Agreement has not been terminated or voided, has not expired, and continues to govern the relationship between Raymond James and FA.

    d.    The Affiliation Agreement between FA and Crux and/or the Principal has not been

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14F5

terminated or voided, has not expired and continues to govern the relationship between Crux and/or the Principal, on the one hand, and FA, on the other hand.

       e.      FA must not have had any sanctions, fines, probations, or other censures levied by any regulatory body or agency during the immediately preceding three-month period.

5. **ADDITIONAL CONDITIONS**: FA understands and agrees that bonus payments will not be paid to FA if FA is no longer affiliated with either Raymond James or Crux for any reason, including, but not limited to, death. FA understands and agrees that if FA is not eligible for a quarterly bonus payment, the bonus will not be paid even if FA meets the requirements in subsequent quarters.

6. **INCOME TAXES**: FA expressly understands and agrees that all bonus payments are considered earned income in the year paid. Accordingly, FA understands and agrees to be liable for any Federal Income tax, Social Security tax, Medicare tax, state tax, city tax.

7. **PERFORMANCE OF DUTIES**: FA has and will comply with the rules and regulations of the Securities and Exchange Commission, applicable regulatory agencies, self-regulatory organizations, state and federal laws and the policies and procedures of Raymond James and Crux.

8. **TERMINATION**: Crux shall have the right to terminate this Agreement (immediately and without notice) upon the occurrence of the insolvency of, appointment of receiver for, assignment for the benefit of creditors by, or the commencement of a proceeding under bankruptcy or insolvency law by or against, FA.

9. **NOT AN EMPLOYMENT CONTRACT**: FA expressly acknowledges that this Agreement is not an employment contract and that nothing in this Agreement shall be construed to alter the nature of the independent contractor relationship between FA and Raymond James, the affiliation between FA, on the one hand and Crux or the Principal on the other hand, or to confer on FA any right of continued association or affiliation for a particular term of time or require cause for termination of the relationship.

10. **INTEGRATION**: All discussions, negotiations and prior agreements are incorporated herein. Further, FA acknowledges that this Agreement represents the entire understanding between Crux and FA with regard to bonus payments.

11. **MODIFICATIONS**: This Agreement may not be modified except in writing signed by both Parties. Oral modifications of this Agreement are void and unenforceable.

12. **ARBITRATION AND CHOICE OF LAW**: The Parties agree that any disputes, claim, or controversy concerning this Agreement shall be resolved by binding arbitration in accordance with the then existing Rules of FINRA and its Code of Arbitration Procedure. Judgment upon the award rendered by the Arbitrators may be entered in any court having jurisdiction thereof. The Parties agree that the statutes of limitation and repose of the laws of the State of Delaware, shall apply to all arbitration proceedings arising out of or relating to this Agreement such that all claims, which would have been barred, waived, limited or restricted by such laws if filed with the judiciary, shall also be forever barred from claims under any applicable arbitration (or mediation) proceedings. Failure to institute an arbitration (or mediation) proceeding within the periods required for filing a claim or initiating a suit under such laws shall constitute an absolute bar (and a waiver thereof) to making a claim under this Agreement and to instituting any such arbitration (or mediation) proceedings respecting such controversy or claim. This Agreement to arbitrate survives the termination of FA's affiliation with Crux. Further, this Agreement shall be interpreted in accordance with the laws of the State of Delaware.

13. **ASSIGNMENT**: FA may not assign this Agreement. Crux may assign this Agreement to any successor

in interest, affiliate or subsidiary.

14. **WAIVER**: Crux's failure to enforce a breach of any term of this Agreement shall not be construed to be a waiver of any subsequent or any other breach, and no waiver shall be deemed made, unless the same is so acknowledged by Crux in writing. Further, Crux's failure to exercise any right under this Agreement (or its partial exercise of any such right) shall not constitute a waiver of the right to exercise the same or any other right at another time.

15. **CONFLICT**: In the event of any conflict between the terms and conditions set forth in this Agreement and those set forth in the Affiliation Agreement between FA on the one hand and either Crux or the Principal on the other hand, the terms and conditions of the Affiliation Agreement shall control.

16. **CONFIDENTIALITY**: THE EXISTENCE OF THE BONUS THAT IS THE SUBJECT OF THIS AGREEMENT SHALL BE KEPT IN STRICTEST CONFIDENCE BY FA AND SHALL NOT BE DISCLOSED EXCEPT IN RESPONSE TO A WRITTEN INQUIRY FROM A SELF REGULATORY ORGANIZATION OR GOVERNMENTAL AGENCY, A PROPERLY ISSUED JUDICIAL PROCESS, A SUBPOENA FROM AN ARBITRATION PANEL OR FOR THE LIMITED PURPOSES OF ALLOWING FA TO PREPARE REQUIRED TAX REPORTING FORMS AND TO RESPOND TO INQUIRIES FROM STATE OR FEDERAL TAX AUTHORITIES.

In the event that FA is served with judicial process, a subpoena from an arbitration panel or any other forum, or a written inquiry from any self-regulatory organization seeking disclosure of matters relating to the grant of existence of the bonus that is the subject of this Agreement, the undersigned shall immediately provide written notice of such process to Crux in order that Crux may seek to protect its interest in preserving the confidentiality of such matters. Nothing in this Agreement shall prohibit or limit FA from initiating communications with, or responding to an inquiry from, any regulatory authority or governmental agency or entity, to report possible violations of federal law or regulation, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. No prior authorization from Crux shall be required to make any such reports or disclosures and no notice is required to Crux that such reports or disclosures have been made.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

FA acknowledges that (i) he or she has read and understands and consents to all of the terms and conditions of this Agreement, (ii) FA had the opportunity to consult with independent legal counsel regarding the terms of this Agreement, (iii) the execution of this Agreement is a voluntary act and (iv) his or her signature binds FA to the terms of this Agreement.

*Garry Whitfield*

_____
Signature of FA


Garry Whitfield
_____
Print Name of FA


5/2/2022
_____
Date



ACKNOWLEDGED AND AGREED TO:

CRUX WEALTH ADVISORS, LLC


*Travis Alexander*

By: _____
Name:  Travis Alexander
Title:  CEO

**CRUX WEALTH ADVISORS, LLC**

Affiliation Loan Agreement

This AFFILIATION LOAN AGREEMENT (this "Agreement") is made on May 2nd, 2022 (the "Effective Date") by and between Crux Wealth Advisors, LLC (referred to hereinafter as "Crux") and Russell Bacon (referred to hereinafter as "FA"). Crux and FA may be referred to herein individually as a "Party" or collectively as the "Parties".

RECITALS

WHEREAS, FA has requested that Crux make a loan to FA (the "Loan"), and Crux has agreed to make the Loan, in an amount that has been agreed upon by Crux and FA (the "Loan Amount"), subject to the terms and conditions set forth in this Agreement and provided that FA agrees to repay the Loan in accordance with this Agreement and otherwise agrees to comply with his obligations under this Agreement.

NOW, THEREFORE, in consideration of the Loan, and in reliance on the covenants, terms and conditions set forth in this Agreement, Crux and FA agree as follows:

**1.      LOAN**

1.1     FA shall sign and deliver to Crux a Loan Schedule and Acknowledgement ("LSA") in the form attached to this Agreement as <u>Exhibit A</u> which specifies the Loan Amount agreed upon by Crux and FA. Upon FA's execution of the LSA, Crux shall lend the Loan Amount to FA. Upon FA's execution of the LSA, Crux shall lend the Loan Amount to FA. The interest rate for any such Loan shall be 1.88% (compounded daily) (the "Applicable Rate") and the Loan payoff period shall be as provided in the LSA. As long as both (x) FA's registration with Raymond James has not terminated and (y) FA's affiliation with Crux and/or its principal, Travis Alexander (the "Principal") has not terminated, FA shall pay a quarterly payment amount based on the LSA (the "Payments").

1.2     In the event that there are insufficient funds available on FA's blotter on the respective payout date to deduct all or any part of the principal or interest then due, Crux may, in its sole discretion, allow the unpaid amounts to be carried over to the following month's blotter and be deducted from that subsequent month's blotter, in addition to the principal and interest to become due in such following month ("Optional Rollover") or may declare an Event of Default in accordance with the provisions of this Agreement. FA understands that any Optional Rollover will be rolled over for no longer than three (3) consecutive months and that any rolled over amount plus any additional rolled over amount for the second month, plus the full payment amount due at the end of the third month following the Optional Rollover will be due at the end of such three (3) month period.

**2.      REPRESENTATION AND WARRANTIES, AGREEMENTS.**

2.1     FA will comply with all the terms and conditions of this Agreement and any other documents executed pursuant hereto. and will, if requested by Crux, execute all instruments necessary to consummate the transactions contemplated hereby.

2.2     FA has the full authority to enter into this Agreement and to comply with these provisions.

2.3     There is no material action, suit, proceeding, inquiry or investigation, at law or in equity, before any court, public body, or applicable regulatory body, pending or, to the best of FA's knowledge, threatened

which seeks to restrain or enjoin FA from entering into or complying with this Agreement or which could impact FA's registration as a financial advisor.

2.4    To the extent permitted by applicable law, FA hereby releases and holds Crux, the Principal and their affiliates harmless from any claim arising out of FA's actions or omissions in connection with the Loan, including but not limited to FA's activities financed by this Loan. This paragraph shall survive the termination of this Agreement.

2.5    FA is solvent and no proceeding under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, an assignment of substantially all assets, composition or other relief with respect to FA's debts has been initiated on a voluntary or involuntary basis in the last ten (10) years or is contemplated by FA as of the Effective Date.

2.6    FA has disclosed to Crux all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

**3.    EVENT OF DEFAULT**. The occurrence of one or more of the following events will, at the option of Crux, constitute an event of default (an "Event of Default") hereunder:

3.1    FA's breach of or other failure to perform any term of this Agreement, the Raymond James Financial Services, Inc., the Independent Branch Owner Agreement ("IBOA"), the Raymond James Financial Services, Inc. FA Agreement ("FA Agreement"), or any other agreement entered into by either (1) FA and Raymond James, (2) FA and Crux (including, without limitation any affiliation agreement) or (3) FA and the Principal (including, without limitation any affiliation agreement);

3.2    Any warranty, representation or other statement by, or on behalf of, FA contained in this Agreement or in any information furnished in compliance with or in reference to this Agreement or the IBOA or FA Agreement or any other agreement FA may enter into with either Crux or the Principal (including, without limitation any affiliation agreement) is deemed to be false or misleading;

3.3    FA's association with Raymond James terminates for any reason whatsoever, including, but not limited to, Raymond James's termination of the relationship at any time, including as a result of FA's death or disability, while any part of the Loan (including accrued interest) remains outstanding;

3.4    FA's affiliation with either Crux or the Principal terminates for any reason whatsoever, including, but not limited to, either Crux or the Principal's termination of the relationship at any time, including as a result of FA's death or disability, while any part of the Loan (including accrued interest) remains outstanding;

3.5    FA's failure to remain registered as described in Paragraph 7 below;

3.6    FA's insolvency, the appointment of a receiver for any part of FA's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against FA; or

3.7    Crux in its discretion declares an Event of Default under Section 1.2 hereof.

**4.    REMEDIES**. Upon the occurrence of any Event of Default, Crux shall have the right, at any time thereafter immediately and without further notice, presentment or demand, to pursue any of the following remedies separately, successively or simultaneously:

4.1     Discharge Crux's responsibilities to FA under this Agreement and declare the outstanding balance of the Loan, any accrued interest on the Loan, and any or all other indebtedness then owing by FA to Crux immediately due and payable without presentation, demand for payment, notice of dishonor, protest, or notice of protest of any kind, all of which FA hereby expressly waives, and institute proceedings for collection. Upon the occurrence of an Event of Default, interest shall accrue on all outstanding principal and interest under this Loan at a rate of 10% per annum (the "Default Rate"); and

4.2.    File for arbitration (or suit if appropriate) and obtain judgment and, in conjunction with any action, Crux or the Principal may seek ancillary remedies provided by law, including levy of attachment and garnishment.

5.      **ADDITIONAL REMEDIES**. Upon an Event of Default, FA acknowledges and agrees that:

5.1     Crux shall be entitled to any costs of collection, including reasonable internal and external attorneys' fees and the cost of defending any counterclaims. Said costs of collection shall include all incidental legal expenses, travel costs, and forum costs;

5.2     Crux reserves the right, without foreclosing any other remedy that may be available to Crux, to withhold and setoff or deduct any indebtedness against any compensation, including but not limited to any commissions and fees, earned by FA but not yet paid to FA, along with any assets of FA (individually, jointly with others, or in any other capacity) held at Raymond James or at any affiliated entities, in order to offset any indebtedness FA owes Crux under this Agreement; and

5.3     FA will execute a reaffirmation of the Loan under this Agreement prior to any discharge of debt under any bankruptcy or insolvency proceeding and file the reaffirmation, along with all the required disclosures and statement of current income and expenses with the relevant court.

6.      **COSTS AND EXPENSES**. FA will pay to Crux and/or the Principal all costs and expenses reasonably incurred by Crux and/or the Principal for the purpose of maintaining, preserving, or enforcing their rights hereunder, including:

6.1     the cost of collection;

6.2     costs of obtaining money damages; and

6.3     a reasonable fee for the services of attorneys used by Crux and/or the Principal for any purpose related to this Agreement or the Loan, including consultation, drafting documents, sending notices, or instituting, prosecuting or defending litigation or arbitration, whether out of court, in trial, on appeal, in bankruptcy, or otherwise.

All costs and expenses shall be payable by FA to Crux and/or the Principal upon demand and shall bear interest at the Default Rate from demand until paid.

7.      **REGISTRATION.** FA understands and agrees that the loan of any amount under this Agreement is conditioned on FA's registration being approved by and continuing with the Financial Industry Regulatory Authority ("FINRA"), and any exchange or state in which FA seeks to conduct business.

8.      **SETOFF**. FA hereby grants to Crux a secured interest and a right of set off for the Loan upon any and all moneys, securities, and other property of FA and the proceeds thereof, now or hereafter held or received by or in transit to, Raymond James, or at any affiliated entities, from or for FA, and also upon any and all deposits (general or special) and credits of FA at Raymond James, or at any affiliated entities, at any

time existing. Upon the occurrence of an Event of Default, Crux is authorized at any time and from time to time, without notice to FA, to set off, appropriate, and apply any or all items referred to in this section 8 against the Loan, pursuant to the right of set off.

9.    **INTEGRATION**. This Agreement (including any amendments, exhibits and addendums attached hereto) contains all of the agreements, representations and understandings made between the Parties with respect to the subject matter hereof, and supersedes all prior discussions, agreements and understandings of any kind, whether written or oral, and of every nature between them.

10.    **CONSENT TO INJUNCTIVE RELIEF AND/OR PREJUDGMENT WRIT OF GARNISHMENT**. FA warrants, covenants and agrees that Crux shall have no adequate remedy at law for a breach of or violation of the covenants contained in this Agreement. FA consents to the issuance of a temporary restraining order or a preliminary or permanent injunction to prohibit the breach of any provision of this Agreement, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated. FA consents to a prejudgment writ of attachment and/or garnishment in Court for any assets held (individually, jointly with others, or in any other capacity) outside of Raymond James. FA agrees that Crux does not waive any remedy at law in its efforts to secure injunctive relief and/or a prejudgment writ of attachment and/or garnishment if it files in Court, and specifically does not waive its right to arbitration of this Agreement. FA also understands that Crux may also be entitled to monetary damages, including, but not limited to, reasonable attorney's fees and costs, in the event of a breach or violation of this Agreement by FA, or any collection of this Agreement, in Court and/or in arbitration.

11.    **MODIFICATION**. This Agreement may not be modified except in writing signed by both Parties. Oral modifications of this Agreement are void and unenforceable.

12.    **TERMINATION**. This Agreement shall terminate upon FA's full repayment of the Loan Amount, any accrued interest and any other amounts due and owing by FA pursuant to this Agreement.

13.    **ARBITRATION AND CHOICE OF LAW**. The Parties agree that any dispute, claim, or controversy concerning this Agreement shall be resolved by binding arbitration in accordance with the then existing Rules of FINRA and its Code of Arbitration Procedure. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The Parties agree that the statutes of limitation and repose of the laws of the State of Delaware, shall apply to all arbitration proceedings arising out of or relating to this Agreement such that all claims, which would have been barred, waived, limited or restricted by such laws if filed with the judiciary, shall also be forever barred from claims under any applicable arbitration (or mediation) proceedings. Failure to institute an arbitration (or mediation) proceeding within the periods required for filing a claim or initiating a suit under such laws shall constitute an absolute bar (and a waiver thereof) to making a claim under this Agreement and to instituting any such arbitration (or mediation) proceedings respecting such controversy or claim. This Agreement to arbitrate survives the termination of FA's affiliation with Crux and/or the Principal. Further, this Agreement shall be interpreted in accordance with the laws of the State of Delaware.

14.    **ASSIGNMENT**. FA may not assign his or her rights or obligations under this Agreement. Notwithstanding the foregoing, Crux may assign its rights, responsibilities and obligations to a parent (direct or indirect), subsidiary or an affiliate thereof.

15.    **NOT AN EMPLOYMENT CONTRACT / AFFILIATION EXPLAINED**. FA expressly acknowledges that this Agreement is not an employment contract or an agreement to employ the FA for a specified period of time or a promise of continued employment with either Crux or Raymond James for any period of time whatsoever. FA further expressly acknowledges and agrees that he or she is an independent contractor associated with Raymond James and affiliated with Crux. FA has no authority to bind Crux in

any way.

**16.    SEVERABILITY**. Should any part of this Agreement for any reason be declared by any court (or arbitration panel) of competent jurisdiction to be legally invalid, void, or unenforceable, such decision shall not affect the validity of the remaining portions of this Agreement, which remaining portions shall continue in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated therefrom, it being the intent of the Parties that they would have executed the remaining portions of this Agreement without including any such part or portion which may for any reason be declared invalid, void, or unenforceable.

**17.    WAIVERS**. FA waives presentment, protest and notice of dishonor of any negotiable or commercial paper to which it is or may become a party, that may at any time come into the hands of Crux. Crux shall not, by any act, delay, omission, or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Crux, and then only to the extent therein set forth. A waiver by Crux of any right or remedy on any one occasion shall not be construed as a bar to, or waiver of, any such right or remedy which Crux would otherwise have on any subsequent occasion.

**18.    FURTHER ASSURANCES**. FA agrees to execute any further documents, and to take any further actions, reasonably requested by Crux to evidence or perfect the security interest granted in this Agreement, to maintain the first priority of the security interests, and to effectuate the rights granted to Crux herein.

**19.    WAIVER OF GARNISHMENT OF WAGES**. If FA is a head of a family, to the extent permitted by applicable law, FA hereby knowingly, voluntarily, and intentionally waives any applicable exemption FA may have for attachment or garnishment of FA's disposable earnings in excess of $500.00 a week, and agrees that upon an Event of Default, Crux may attach or garnish such disposable earnings, subject to any applicable state or federal law limitations. If FA is not a head of a family, to the extent permitted by applicable law, FA understands that Crux may attach or garnish FA's disposable earnings, subject only to any applicable state or federal law limitations. For these purposes, FA's "disposable earnings" means any earnings remaining after the deduction of any amounts required by law to be withheld.

**20.    NO SETOFF RIGHT OF FA**. Claims of the FA arising out of his or her independent contractor relationship shall not be asserted as a basis for non-payment of the Loan. The FA has no right of set-off the amounts due under this Agreement.

**21.    MISCELLANEOUS**. In this Agreement, the terms "include," "including," "includes" are deemed to be followed by the words "without limitation." The terms "hereof," "hereunder," and "herein" shall refer to this Agreement as a whole and not to any particular section.

**22.    COUNTERPARTS**. This Agreement may be executed in one or more counterparts, each of which will be an original and all of which together will be deemed one and the same document.

**23.    CONFIDENTIALITY**. THE EXISTENCE OF THE LOAN THAT IS THE SUBJECT OF THIS AGREEMENT SHALL BE KEPT IN STRICTEST CONFIDENCE BY FA AND SHALL NOT BE DISCLOSED EXCEPT IN RESPONSE TO A WRITTEN INQUIRY FROM A SELF REGULATORY ORGANIZATION OR GOVERNMENTAL AGENCY, A PROPERLY ISSUED JUDICIAL PROCESS, A SUBPOENA FROM AN ARBITRATION PANEL OR FOR THE LIMITED PURPOSES OF ALLOWING FA TO PREPARE REQUIRED TAX REPORTING FORMS AND TO RESPOND TO INQUIRIES FROM STATE OR FEDERAL TAX AUTHORITIES.

In the event that FA is served with judicial process, a subpoena from an arbitration panel or any other forum, or a written inquiry from any self-regulatory organization seeking disclosure of matters relating to the grant

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14E5

of existence of the Loan that is the subject of this Agreement, the undersigned shall immediately provide written notice of such process to Crux in order that Crux may seek to protect its interest in preserving the confidentiality of such matters. Nothing in this Agreement shall prohibit or limit FA from initiating communications with, or responding to an inquiry from, any regulatory authority or governmental agency or entity, to report possible violations of federal law or regulation, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. No prior authorization from Crux shall be required to make any such reports or disclosures and no notice is required to Crux that such reports or disclosures have been made.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

FA acknowledges that (i) he or she has read and understands and consents to all of the terms and conditions of this Agreement, (ii) FA had the opportunity to consult with independent legal counsel regarding the terms of this Agreement, (iii) the execution of this Agreement is a voluntary act and (iv) his or her signature binds FA to the terms of this Agreement.

_____
Signature of FA


Russell Bacon
_____
Print Name of FA


5/2/2022
_____
Date



ACKNOWLEDGED AND AGREED TO:

CRUX WEALTH ADVISORS, LLC


By: _____
Name:  Travis Alexander
Title:  CEO

**Loan Schedule & Acknowledgement**

**Exhibit A to Affiliation Loan Agreement, Dated May 2nd, 2022, by and between Crux Wealth Advisors, LLC and Russell Bacon, Financial Advisor**

1.        Loan Amount: $91,871.56

2.        First Month of Payor Deductions: July 2022

3.        Last Month of Payor Deductions: April 2027

4.        The foregoing is subject to the terms of the Affiliation Loan Agreement entered into between Crux Wealth Advisors, LLC and the undersigned dated May 2nd, 2022.

5.        Loan Amortization Schedule is attached hereto.

Loan receipt acknowledged and schedule accepted:

_____
Signature of Financial Advisor

Russell Bacon
_____
Print Name of Financial Advisor

5/2/2022
_____
Date Signed

## Loan Amortization Schedule

| # | Payment | Principal | Interest | Balance |
|---|---------|-----------|----------|---------|
| 1 | 2,525.37 | 2,092.56 | 432.81 | 89,779.00 |
| 2 | 2,525.37 | 2,102.42 | 422.95 | 87,676.58 |
| 3 | 2,525.37 | 2,112.33 | 413.04 | 85,564.25 |
| 4 | 2,525.37 | 2,122.28 | 403.09 | 83,441.97 |
| 5 | 2,525.37 | 2,132.27 | 393.10 | 81,309.70 |
| 6 | 2,525.37 | 2,142.32 | 383.05 | 79,167.38 |
| 7 | 2,525.37 | 2,152.41 | 372.96 | 77,014.97 |
| 8 | 2,525.37 | 2,162.55 | 362.82 | 74,852.42 |
| 9 | 2,525.37 | 2,172.74 | 352.63 | 72,679.68 |
| 10 | 2,525.37 | 2,182.98 | 342.39 | 70,496.70 |
| 11 | 2,525.37 | 2,193.26 | 332.11 | 68,303.44 |
| 12 | 2,525.37 | 2,203.59 | 321.78 | 66,099.85 |
| 13 | 2,525.37 | 2,213.97 | 311.40 | 63,885.88 |
| 14 | 2,525.37 | 2,224.40 | 300.97 | 61,661.48 |
| 15 | 2,525.37 | 2,234.88 | 290.49 | 59,426.60 |
| 16 | 2,525.37 | 2,245.41 | 279.96 | 57,181.19 |
| 17 | 2,525.37 | 2,255.99 | 269.38 | 54,925.20 |
| 18 | 2,525.37 | 2,266.62 | 258.75 | 52,658.58 |
| 19 | 2,525.37 | 2,277.30 | 248.07 | 50,381.28 |
| 20 | 2,525.37 | 2,288.02 | 237.35 | 48,093.26 |
| 21 | 2,525.37 | 2,298.80 | 226.57 | 45,794.46 |
| 22 | 2,525.37 | 2,309.63 | 215.74 | 43,484.83 |
| 23 | 2,525.37 | 2,320.51 | 204.86 | 41,164.32 |
| 24 | 2,525.37 | 2,331.44 | 193.93 | 38,832.88 |

| | | | | |
|---|---|---|---|---|
| 25 | 2,525.37 | 2,342.43 | 182.94 | 36,490.45 |
| 26 | 2,525.37 | 2,353.46 | 171.91 | 34,136.99 |
| 27 | 2,525.37 | 2,364.55 | 160.82 | 31,772.44 |
| 28 | 2,525.37 | 2,375.69 | 149.68 | 29,396.75 |
| 29 | 2,525.37 | 2,386.88 | 138.49 | 27,009.87 |
| 30 | 2,525.37 | 2,398.13 | 127.24 | 24,611.74 |
| 31 | 2,525.37 | 2,409.42 | 115.95 | 22,202.32 |
| 32 | 2,525.37 | 2,420.77 | 104.60 | 19,781.55 |
| 33 | 2,525.37 | 2,432.18 | 93.19 | 17,349.37 |
| 34 | 2,525.37 | 2,443.64 | 81.73 | 14,905.73 |
| 35 | 2,525.37 | 2,455.15 | 70.22 | 12,450.58 |
| 36 | 2,525.37 | 2,466.72 | 58.65 | 9,983.86 |
| 37 | 2,525.37 | 2,478.34 | 47.03 | 7,505.52 |
| 38 | 2,525.37 | 2,490.01 | 35.36 | 5,015.51 |
| 39 | 2,525.37 | 2,501.74 | 23.63 | 2,513.77 |
| 40 | 2,525.61 | 2,513.77 | 11.84 | 0.00 |

## CRUX WEALTH ADVISORS, LLC

Bonus Agreement

This BONUS AGREEMENT (this "Agreement") is made May 2nd, 2022 (the "Effective Date") by and between Crux Wealth Advisors, LLC (referred to hereinafter as "Crux") and Russell Bacon (referred to hereinafter as "FA")

WHEREAS, Raymond James and FA entered into either the Raymond James Financial Services, Inc. ("RJFS" or "Raymond James") Independent Branch Owner Agreement ("IBOA"), or the Raymond James Financial Services, Inc. FA Agreement ("FA Agreement"), and the IBOA and the FA Agreement are hereinafter referred to as the "Advisor Agreement," wherein Raymond James and FA memorialized the terms under which FA shall conduct certain securities activities as an independent contractor of Raymond James;

WHEREAS, FA and the principal of Crux, Travis Alexander (the "Principal"), entered into an Affiliation Agreement, May 2nd, 2022 (the "Affiliation Agreement"); and

WHEREAS, Crux has agreed to pay a quarterly bonus to FA, as more particularly described herein.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable considerations, the receipt, sufficiency and adequacy of which are hereby acknowledged, Crux and FA agree as follows:

1. **BONUS**: Crux shall pay quarterly to FA $2,296.79 for a period of 40 quarters. For purposes of this Agreement, "quarterly" and "quarter" shall mean every three months based on Crux's fiscal year, commencing with the first full fiscal quarter of the FA's affiliation with RJFS and Crux.

2. **REGISTRATION**: FA understands and agrees that payment of any bonus under this Agreement is conditioned on FA satisfying all registration and licensure requirements, as described in the Advisor Agreement that FA has or will enter into with Raymond James and the Affiliation Agreement. Failure of FA to satisfy said requirements for any reason shall discharge all obligations of Crux under this Agreement.

3. **TIMING OF PAYMENTS**: Payments will be made quarterly during the second payroll period of the month immediately following the last month of each quarter. The first payment will be made during the second payroll period of the month immediately following the first full fiscal quarter of FA's affiliation with Crux.

4. **ELIGIBILITY**: FA understands and agrees that certain conditions must be met as of the dates that each of the quarterly bonus payments is made in order to be eligible for each such bonus payment. Conditions of eligibility as of each of those dates are:

    a.        FA must satisfy all registration and licensure requirements, as described in Article 2, Registration.

    b.        FA continues to act in the capacity of a financial advisor.

    c.        The Advisor Agreement has not been terminated or voided, has not expired, and continues to govern the relationship between Raymond James and FA.

    d.        The Affiliation Agreement between FA and Crux and/or the Principal has not been

terminated or voided, has not expired and continues to govern the relationship between Crux and/or the Principal, on the one hand, and FA, on the other hand.

       e.      FA must not have had any sanctions, fines, probations, or other censures levied by any regulatory body or agency during the immediately preceding three-month period.

5. **ADDITIONAL CONDITIONS**: FA understands and agrees that bonus payments will not be paid to FA if FA is no longer affiliated with either Raymond James or Crux for any reason, including, but not limited to, death. FA understands and agrees that if FA is not eligible for a quarterly bonus payment, the bonus will not be paid even if FA meets the requirements in subsequent quarters.

6. **INCOME TAXES**: FA expressly understands and agrees that all bonus payments are considered earned income in the year paid. Accordingly, FA understands and agrees to be liable for any Federal Income tax, Social Security tax, Medicare tax, state tax, city tax.

7. **PERFORMANCE OF DUTIES**: FA has and will comply with the rules and regulations of the Securities and Exchange Commission, applicable regulatory agencies, self-regulatory organizations, state and federal laws and the policies and procedures of Raymond James and Crux.

8. **TERMINATION**: Crux shall have the right to terminate this Agreement (immediately and without notice) upon the occurrence of the insolvency of, appointment of receiver for, assignment for the benefit of creditors by, or the commencement of a proceeding under bankruptcy or insolvency law by or against, FA.

9. **NOT AN EMPLOYMENT CONTRACT**: FA expressly acknowledges that this Agreement is not an employment contract and that nothing in this Agreement shall be construed to alter the nature of the independent contractor relationship between FA and Raymond James, the affiliation between FA, on the one hand and Crux or the Principal on the other hand, or to confer on FA any right of continued association or affiliation for a particular term of time or require cause for termination of the relationship.

10. **INTEGRATION**: All discussions, negotiations and prior agreements are incorporated herein. Further, FA acknowledges that this Agreement represents the entire understanding between Crux and FA with regard to bonus payments.

11. **MODIFICATIONS**: This Agreement may not be modified except in writing signed by both Parties. Oral modifications of this Agreement are void and unenforceable.

12. **ARBITRATION AND CHOICE OF LAW**: The Parties agree that any disputes, claim, or controversy concerning this Agreement shall be resolved by binding arbitration in accordance with the then existing Rules of FINRA and its Code of Arbitration Procedure. Judgment upon the award rendered by the Arbitrators may be entered in any court having jurisdiction thereof. The Parties agree that the statutes of limitation and repose of the laws of the State of Delaware, shall apply to all arbitration proceedings arising out of or relating to this Agreement such that all claims, which would have been barred, waived, limited or restricted by such laws if filed with the judiciary, shall also be forever barred from claims under any applicable arbitration (or mediation) proceedings. Failure to institute an arbitration (or mediation) proceeding within the periods required for filing a claim or initiating a suit under such laws shall constitute an absolute bar (and a waiver thereof) to making a claim under this Agreement and to instituting any such arbitration (or mediation) proceedings respecting such controversy or claim. This Agreement to arbitrate survives the termination of FA's affiliation with Crux. Further, this Agreement shall be interpreted in accordance with the laws of the State of Delaware.

13. **ASSIGNMENT**: FA may not assign this Agreement. Crux may assign this Agreement to any successor

in interest, affiliate or subsidiary.

14. **WAIVER**: Crux's failure to enforce a breach of any term of this Agreement shall not be construed to be a waiver of any subsequent or any other breach, and no waiver shall be deemed made, unless the same is so acknowledged by Crux in writing. Further, Crux's failure to exercise any right under this Agreement (or its partial exercise of any such right) shall not constitute a waiver of the right to exercise the same or any other right at another time.

15. **CONFLICT**: In the event of any conflict between the terms and conditions set forth in this Agreement and those set forth in the Affiliation Agreement between FA on the one hand and either Crux or the Principal on the other hand, the terms and conditions of the Affiliation Agreement shall control.

16. **CONFIDENTIALITY**: THE EXISTENCE OF THE BONUS THAT IS THE SUBJECT OF THIS AGREEMENT SHALL BE KEPT IN STRICTEST CONFIDENCE BY FA AND SHALL NOT BE DISCLOSED EXCEPT IN RESPONSE TO A WRITTEN INQUIRY FROM A SELF REGULATORY ORGANIZATION OR GOVERNMENTAL AGENCY, A PROPERLY ISSUED JUDICIAL PROCESS, A SUBPOENA FROM AN ARBITRATION PANEL OR FOR THE LIMITED PURPOSES OF ALLOWING FA TO PREPARE REQUIRED TAX REPORTING FORMS AND TO RESPOND TO INQUIRIES FROM STATE OR FEDERAL TAX AUTHORITIES.

In the event that FA is served with judicial process, a subpoena from an arbitration panel or any other forum, or a written inquiry from any self-regulatory organization seeking disclosure of matters relating to the grant of existence of the bonus that is the subject of this Agreement, the undersigned shall immediately provide written notice of such process to Crux in order that Crux may seek to protect its interest in preserving the confidentiality of such matters. Nothing in this Agreement shall prohibit or limit FA from initiating communications with, or responding to an inquiry from, any regulatory authority or governmental agency or entity, to report possible violations of federal law or regulation, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation. No prior authorization from Crux shall be required to make any such reports or disclosures and no notice is required to Crux that such reports or disclosures have been made.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

DocuSign Envelope ID: 64221E4F-C4DC-4739-9CB9-8381671F14F5

FA acknowledges that (i) he or she has read and understands and consents to all of the terms and conditions of this Agreement, (ii) FA had the opportunity to consult with independent legal counsel regarding the terms of this Agreement, (iii) the execution of this Agreement is a voluntary act and (iv) his or her signature binds FA to the terms of this Agreement.

_____
Signature of FA

Russell Bacon
_____
Print Name of FA

5/2/2022
_____
Date

ACKNOWLEDGED AND AGREED TO:

CRUX WEALTH ADVISORS, LLC

By: _____
Name:  Travis Alexander
Title:  CEO

# Exhibit 4: Notice of Termination of Affiliation Email (Apr. 18, 2024)

**From:** Garry Whitfield <Garry.Whitfield@paracletewealthpartners.com>
**Sent:** Thursday, April 18, 2024 1:29 PM
**To:** Travis Alexander <Travis.Alexander@cruxwealth.com>
**Cc:** David Colley <David.Colley@cruxwealth.com>; Rusty Bacon <Rusty.Bacon@paracletewealthpartners.com>
**Subject:** Follo Up to Our Call

Travis,

Thank you for taking the time to speak with us the other day and walking us through the opportunity to join you on the next phase of the Crux journey. After thorough and careful consideration for all involved, we have decided that it's not in the best interest of our clients to entertain another move at this time. Accordingly, we are writing to notify you of our decision to remain at Raymond James and, consequently, depart from the Crux OSJ affiliation.

We appreciate your understanding and certainly wish you all the success as you moved forward into the future.

Sincerely,

Garry

**Garry Whitfield** - MST, CPA*, CVA*, PFS*

Senior Wealth Management Advisor, RJFS

## Paraclete Wealth Partners, LLC

Affiliate of Crux Wealth Advisors, LLC | An Independent Group

901 S Mopac Expressway, Bldg. 5, Suite 260, Austin, TX 78746

Office: 737.228.1465 | Fax: 737.228.1507| garry.whitfield@paracletewealthpartners.com

*Licenses inactive



Learn more at www.ParacleteWealthPartners.com

  

Paraclete Wealth Partners, LLC and Crux Wealth Advisors, LLC is not a registered broker/dealers and are independent of Raymond James Financial Services, Inc. Investment Advisory services offered through Raymond James Financial Services Advisors, Inc.